Sylvia EVANS, Administrator
of the Estate of Andrew
Evans, Deceased,

and

Bertha Balark, Dana Balark, Anne Balark, and Dane Balark, by themselves and for all others similarly situated, Plaintiffs–Appellees,

v.

CITY OF CHICAGO, a municipal corporation, Defendant–Appellant.

No. 91–3277.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1992.

Decided June 3, 1993.

Order Granting Rehearing with Suggestion for Rehearing En Banc; Judgment Opinion Vacated Aug. 19, 1993.

John B. Cashion, Edward T. Stein (argued), Chicago, IL for Sylvia Evans.

Edward T. Stein, Clifford Zimmerman, Cecile Singer, Chicago, IL, for Bertha Balark, Dana Balark, Anne Balark and Dane Balark.

Ruth M. Moscovitch, Asst. Corp. Counsel, Lawrence Rosenthal, Deputy Corp. Counsel, Kelly R. Welsh, Asst. Corp. Counsel, Brian Trubitt, Benna R. Solomon (argued), Office of Corporation Counsel, Appeals Div., Chicago, IL, for City of Chicago.

Before CUDAHY and EASTERBROOK, Circuit Judges, and LEE, District Judge.[1]

WILLIAM C. LEE, District Judge.

This is an appeal from a district court order reinstating and modifying a consent decree.

### Procedural Background

This case began on November 4, 1977, when plaintiff Sylvia Evans filed suit under 42 U.S.C. § 1983 against officers of the City of Chicago. In this suit, Evans claimed that the City's practice of paying small tort judgments before large ones regardless of the dates on which the judgments were entered, and the City's practice of delaying payment of large tort judgments, violated the Equal

---

1. The Honorable William C. Lee, United States District Judge for the Northern District of Indiana, is sitting by designation.

Protection and Due Process clauses of the United States Constitution. The City of Chicago was later added as a defendant, and the case was certified as a class action on January 2, 1980. On May 14, 1979, plaintiffs Bertha Balark, Dana Balark, Anne Balark, and Dane Balark filed suit under 42 U.S.C. § 1983 against the City of Chicago and certain of its officers asserting similar violations. The *Balark* case was certified as a class action on August 15, 1980. On June 18, 1979, plaintiff Curtis Collum also filed suit under 42 U.S.C. § 1983 against the City of Chicago and certain of its officers, asserting similar violations of the United States Constitution. The *Collum* case was also certified as a class action on August 15, 1980. On January 28, 1981, the district court consolidated these cases. However, the *Collum* class is not a party to this appeal.

The class certified in *Evans* consisted of persons holding large judgments against the City who had not been paid within the first two fiscal years after the entry of their judgments. *Evans v. City of Chicago*, 689 F.2d 1286, 1290 n. 6 (7th Cir.1982) ("*Evans I*"). The class certified in *Balark* consisted of persons holding large unpaid judgments against the City, which judgments were less than two years old. *Id.* at 1291 n. 7.

On January 28, 1981, the district court entered partial summary judgment in favor of the *Evans* and *Balark* plaintiff classes and against the defendant City of Chicago, and certified its order for immediate appeal under Rule 54(b) of the Federal Rules of Civil Procedure. The district court's order (1) directed the City to pay all members of the *Evans* class immediately; (2) declared that Ill.Rev.Stat. ch. 85 para. 9–104(b) (1981), violated the Due Process clause of the United States Constitution;[2] (3) specified procedural safeguards to be followed before the City could properly pay judgments in installments; (4) ordered small judgments along with judgments over $1000 to be paid in the order in which they were entered; (5) declared that Ill.Rev.Stat. ch. 24, para. 8–1–16 (1981), violated the Equal Protection clause of the United States Constitution; (6) reserved the question of attorney's fees; and (7) certified the order for immediate appeal under Rule 54(b). The City of Chicago filed a timely notice of appeal from the district court's judgment.

This Court affirmed the district court's judgment on September 27, 1982, stating as follows:

The defendants contend that the City's practice of paying tort judgments of $1,000 or less before tort judgments in excess of $1,000 related rationally to the City's attempt to reduce litigation and interest costs by encouraging quick settlements for $1,000 or less without interest in a large amount of nuisance litigation. The explanation does not survive examination for two reasons. First, the City's practice included immediate payment of fully litigated claims which resulted in judgments of $1,000 or less. Second, the practice did not reduce interest costs since interest accumulated on the sum of the unpaid judgments. The priority given smaller judgments did not reduce that total. Nor does the payment of many small judgments before an equal amount due on large judgments allow the City more effectively to manage its yearly appropriations and limit the City's debt. We discern no rational basis for the City's challenged classifica-

2. The 1981 statute provided:
(a) If a local public entity does not pay a tort judgment or settlement during the fiscal year in which it becomes final and if, in the opinion of its governing body, the unpaid amount of the tort judgment is not too great to be paid out of revenues for the ensuing fiscal year, the governing body shall pay the balance of the judgment during the ensuing year.
(b) If the local public entity does not pay the tort judgment or settlement during the fiscal year when it becomes final and its governing body is of the opinion that the unpaid amount of the judgment or settlement is so great that

undue hardship will arise if the entire amount is paid out of the revenues for the ensuing fiscal year, the governing body shall pay the judgment or settlement, with interest thereon, in not more than 10 annual installments. Each payment shall be of an equal portion of the principal of the tort judgment or settlement. The governing body, in its discretion, may prepay any one or more installments or any part of an installment.
Ill.Rev.Stat. ch. 85, para. 9–104 (1981). Effective November 25, 1986, paragraph 9–104 was amended by P.A. 84–1431.

tion. *See Zobel v. Williams*, [457] U.S. [55], [56–57], 102 S.Ct. 2309, 2311, 72 L.Ed.2d 672 (1982). The district court correctly held the practice and Ill.Rev.Stat., ch. 24, § 8–1–16, insofar as the statute incorporates the practice, unconstitutional. (Footnote omitted.)

*Evans I*, 689 F.2d at 1299–1300.

With respect to the due process challenge to paragraph 9–104(b), this Court ruled that:

Upon review of the relevant statutes and decisions, we agree with the district court that under Illinois law, if the City has not invoked § 9–104(b) before the end of the fiscal year following the year in which the tort judgment became final, the tort judgment holder may legitimately claim entitlement to immediate payment. Thus, at least in that situation, the right to immediate payment of a tort judgment against a municipal corporation becomes a property right under Illinois law.

\*   \*   \*   \*   \*   \*

The record discloses that the governing body of the City never determined that undue hardship would arise if the entire amount of unpaid judgments were paid out of revenues for the fiscal year following the fiscal year in which the judgments became final. Furthermore, the City never subjected the named plaintiffs or any class member to the installment plan method of payment permitted by Ill.Rev.Stat., ch. 85, § 9–104(b). Nor did the City ever tell the named plaintiffs or any class member that it would implement such a plan. Thus the plaintiffs had no standing to attack the constitutionality of that provision. *Blum v. Yaretsky*, [457] U.S. [991], [999], 102 S.Ct. 2777, 2783, 73 L.Ed.2d 534 (1982); *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). Because the district court improperly reached this issue, we vacate paragraph four of the district court's January 28, 1981 order, which declared Ill.Rev.Stat., ch. 85, § 9–104(b) unconstitutional and set forth the minimum procedural safeguards that due process requires before the City may decide to pay a judgment in installments over ten years. In vacating this portion of the court's or-

der, we, of course, express no opinion about the constitutionality of the statute or the appropriateness of the order's procedural safeguards.

*Id.* at 1297, 1299.

The case returned to the district court for further proceedings. Subsequently, the parties entered into negotiations and on May 30, 1984, Judge Grady approved a consent decree. This decree stated in part:

## III.

### *PURPOSES OF CONSENT DECREE*

1. The parties state that they are entering into this Consent Decree for the purpose of avoiding the further expense of protracted litigation over the matters resolved and decided by this Consent Decree. The parties intend this Consent Decree to fully and finally resolve the budgetary and equitable aspects of Plaintiffs' class complaint, reserving only plaintiffs' claims for damages and claims for attorneys' fees. All equitable and legal rights of the plaintiffs are merged into this Consent Decree unless otherwise specified.

5. In consideration of the execution of this Consent Decree, the Defendants, CITY OF CHICAGO, et al., and the Plaintiffs as class representatives, hereby covenant and agree to abide by the Terms of Settlement described in this Consent Decree, thereby fully settling all matters decided therein. The parties, as indicated by the signatures of their counsel below, who are acting with express authority from their respective clients, have determined to finally settle Plaintiffs' claims as described herein by entry of this consent decree subject only to notice to the class and hearing on January 9, 1983 to determine whether the proposed settlement as provided by this Consent Decree should be approved by the court under Rule 23(e) of the Federal Rules of Civil Procedure.

## IV.

### *TERMS OF SETTLEMENT*

1. In consideration of the execution of this Consent Decree and the Release here-

in contained, and in consideration of the dismissal of this lawsuit in all respects, with prejudice and without costs and/or attorneys' fees, against Defendants CLARK BURRUS, Defendant DANIEL GRIM and Defendant WILLIAM QUINLAN, individually and as past Comptrollers and Corporation Counsel, respectively, of the City of Chicago, Defendant CITY OF CHICAGO hereby covenants and agrees to do the things and perform the acts described herein, at the time and in the manner set forth in this Decree, all of which shall be subject to the conditions set forth herein.

   *     *     *     *     *     *

3. Plaintiffs understand, upon advice of counsel, and agree that except as otherwise provided herein, this Decree is a final and total settlement of all claims they now have or may have in the future, arising either directly or indirectly out of or related to Ill.Rev.Stat.1981, ch. 85 § 9–104 and Ill.Rev.Stat.1981, ch. 24 § 8–1–16, as well as under the United States and Illinois Constitutions, except for claims for damages and attorneys fees, as hereinafter specified; and that such finality is applicable to the defendants, the City of Chicago, and its officers, agents and employees.

   *     *     *     *     *     *

5. The Defendant CITY OF CHICAGO, its agents, servants and employees are permanently enjoined from paying final judgments other than by the date of their entry by a court of competent jurisdiction. . . .

   *     *     *     *     *     *

7. For fiscal 1984, the Defendant CITY OF CHICAGO shall appropriate an amount which is expected to be sufficient to satisfy payment of all final judgments which remain unpaid as of December 31, 1983, plus payment of one-half of the estimated liability of the CITY OF CHICAGO for payment of judgments to become final in 1984. In no event shall Defendant CITY OF CHICAGO appropriate less than Thirteen Million Five Hundred Thousand ($13,500,000) Dollars for the payment of judgments in 1984.

8. For fiscal 1985, the CITY OF CHICAGO shall appropriate an amount which is expected to be sufficient to satisfy payment of the full "anticipated liability" of the CITY OF CHICAGO for fiscal 1985. In no event shall defendant CITY OF CHICAGO appropriate less than Twelve Million ($12,000,000) Dollars for the payment of judgments in 1985.

9. For all subsequent fiscal years, the Defendant CITY OF CHICAGO shall submit to the City Council a request for an appropriation of monies sufficient to satisfy payment of the full "anticipated liability" of the CITY OF CHICAGO for payment of judgments for the ensuing fiscal year.

10. Process of tort judgments entered against the CITY OF CHICAGO, its agents, servants and employees thereafter, shall be administered in the following manner:

   *     *     *     *     *     *

(f) Payment of judgment creditors from the date of entry of this Order until May 31, 1985 shall be made when funds become available for payment. Sums budgeted for 1984 and 1985 shall be made available for disbursement in ten (10) monthly installments for each month from March through December of that year.

11. Payment of tort judgments entered against the CITY OF CHICAGO, its agents, servants and employees beginning June 1, 1985 and for subsequent years thereafter shall be processed in the following manner:

(d) . . . Effective June 1, 1985, the Office of the Comptroller shall issue a check in payment of judgments within forty-five (45) days of receipt of all executed documents.

12. In the event that all funds allocated for the payment of tort judgments have been exhausted, the time restrictions of paragraph 10 with respect to payment of tort judgments shall be suspended until such funds become available. All other provisions in paragraph 10 shall remain in full force and effect. When additional allocated funds become available for payment

of tort judgments, all judgments due to be paid during the suspension period for which the proper documentation has been provided shall be paid immediately.

After the entry of the Consent Decree, trial commenced in the district court on the damages issue. At trial, the plaintiffs introduced a new theory of equal protection liability, arguing that the City irrationally chose to delay payment of tort judgments while paying other types of judgments (such as contract claims) immediately. Plaintiffs also reasserted their due process argument. The district court found in favor of the plaintiffs on their new equal protection claim, but did not address the due process claim. Final judgment was entered against the City of Chicago on November 23, 1987. Again, the City of Chicago appealed to this Court, and on April 27, 1989, we reversed the district court and also reversed our ruling in *Evans I. Evans v. City of Chicago*, 873 F.2d 1007, 1012–13 (7th Cir.1989) ("*Evans II*"). We explained our reversal of *Evans I* as follows:

> [I]t is clear that the classification system set up by the City [for paying judgments] should not be struck down by this court. The City offered a number of reasons for its classification system. Most importantly, at the second trial the City argued that paying off smaller judgments early satisfied more claimants; without such a bifurcation of payments, all tort judgment creditors would have experienced lengthy delays. The district court found that the purpose of satisfying more claimants was invalid. However, we find nothing to indicate that such a goal is impermissible. The purpose behind a government enactment need not be laudatory—to pass constitutional muster, the purpose must simply be legitimate. If the court can hypothesize plausible reasons for legislation that are within the legitimate goals of a government, nothing else is required to validate the governmental classification and it does not matter whether the reasons advanced actually motivated the legislative action. *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). Vicious or irrational discrimination violates the equal protection clause. *Jackson v. City of Joliet*, 715

F.2d 1200, 1203 (7th Cir.1983), *cert. denied*, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). No such discrimination is evident in this case. At worst, the City is merely attempting to satisfy as many individual claimants as possible with the limited revenues available. The City's practice of paying small tort judgments in advance of larger ones does not violate the equal protection rights of the holders of large tort judgments. This court's finding in *Evans I* that the City's practice violated equal protection was clearly erroneous and must be reversed.

*Evans II*, 873 F.2d at 1016.

With respect to the plaintiffs' new equal protection theory, we held that:

> In reviewing this holding by the district court [that the City's differentiation between tort and nontort judgments was irrational], we must again apply the rational basis test of equal protection to the City's practice. Under this standard, the City's budgetary scheme does bear some rational relationship to legitimate state ends. The City's practice of charging judgments incurred by enterprise funds to those funds seems rationally related to the concept of such a fund—a self-sustaining or breakeven operation supported by its users. Charging departmental budgets for contract damages conforms to the normal accounting practice of matching expenditures to the appropriate entity that incurred the liability. Similar rational reasons exist for charging personnel damages to the involved department. The 395 Fund is by law a special revenue fund and can only be used for its defined purpose.

> The district court found fault with this system and while it may not be perfect, we do not believe that it sinks to the level of being irrational.

*Id.* at 1017.

Once again the case returned to the district court, where the plaintiffs' motions for attorney's fees were pending. The plaintiffs argued to the district court that, despite their defeat in *Evans II*, they were still the "prevailing parties" for purposes of the attorney fee provision of 42 U.S.C. § 1988, as they

had prevailed in negotiating a consent decree which remained in effect. Plaintiffs' argument prompted the City to move to vacate the consent decree under Rule 60(b)(5) of the Federal Rules of Civil Procedure. The district court granted the City's motion to vacate the consent decree on October 31, 1990 and also denied plaintiffs' petition for attorney's fees.

On November 28, 1990, the plaintiffs moved for reconsideration and on July 25, 1991, the district court, in a bench ruling, reversed its earlier ruling vacating the consent decree and granted in part the motion for reconsideration. Judge Grady explained the basis for his reversal as follows:

> These statements which I have just quoted from my order vacating the consent decree were based upon a misinterpretation of the facts of this case and a misapprehension as to the timing of certain critical events. I emphasized in my order vacating the consent decree that the Court of Appeals in Evans II had said that the due process issue had not survived in the case to the point of the decision in Evans II; namely, 1989. Evans II said nothing whatever about what the status of the due process claim was back in 1984 at the time the consent decree was negotiated and agreed to by the parties except to say in several places that the due process questions considered in Evans I were not before the Court in Evans II. Evans I had not decided the question of whether the City's customary delay in the payment of judgments was a violation of due process. That question was explicitly left open by Evans I. It was not decided by Evans II as is made abundantly clear by Footnotes 8, 11, and 15 of Evans II.
>
> In saying, as I unfortunately did in my order vacating the consent decree, that all legal underpinning for the consent decree had been eliminated by Evans II, I was overlooking the fact that the language in Evans II about the elimination of the due process issue from the case was not addressed to the situation that existed at the time of the entry of the consent decree.

Transcript of July 25, 1991 hearing at 9–10.

On August 2, 1991, Judge Grady entered an "Order Modifying Consent Decree" which stated:

> The court having granted in part and denied in part the motion of the defendant City of Chicago to modify the Consent Decree of May 31, 1984, the said decree is hereby modified as follows: Nothing in the Consent Decree shall require the defendant City of Chicago to pay a final tort judgment under $1,000.00 in any particular order.

On August 8, 1991 the City moved the district court to reconsider its order. On September 9, 1991, the district court denied the City's motion for reconsideration, and on September 30, 1991, the City of Chicago filed its notice of appeal.

### Standard of Review

In a case involving a Rule 60(b)(5) request to modify or vacate a consent decree, the standard of judicial review is deferential. *Duran v. Elrod,* 760 F.2d 756, 761 (7th Cir. 1985). Thus, the district court's determination may be reversed only upon an abuse of discretion and appellate review is limited. *Reinsurance Co. v. Administratia Asigorarilor,* 902 F.2d 1275, 1277 (7th Cir.1990); *Tolliver v. Northrop Corp.,* 786 F.2d 316, 318 (7th Cir.1986).

### Discussion

Appellant City of Chicago contends that, pursuant to Rule 60(b)(5), the consent decree should be modified to respond fully to changes in legal and factual circumstances. The City argues that it changed its practices, as memorialized in the consent decree, to conform with the law as announced in *Evans I,* and now that this Court has repudiated *Evans I* the consent decree should be vacated as it is clear that no part of the City's former practices violates the equal protection clause.

Rule 60(b)(5) of the Federal Rules of Civil Procedure provides in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has

been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application....

The Supreme Court, in *Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, ——, 112 S.Ct. 748, 758, 116 L.Ed.2d 867 (1992), recently reinforced its holding in *Railway Employes v. Wright,* 364 U.S. 642, 647–48, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961), that: "There is ... no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen."

■ The City contends that the legal circumstances in this case have changed. Specifically, the City asserts that the judgment upon which the consent decree was based, *Evans I,* has been overruled by this Court in *Evans II.* Plaintiffs, however, claim that *Evans II* only reversed the equal protection holding of *Evans I,* and the consent decree was based on the alleged due process violations as well as the equal protection violations. The record is clear that the due process issues were not before this Court in *Evans II,* but were completely settled by the parties after *Evans I* was decided and prior to the City's appeal of the district court's ruling in favor of plaintiffs on their new equal protection claim. Although the due process issues were before this Court in *Evans I,* we declined to address the issues due to the plaintiffs' lack of standing to raise the issues. It is clear that we did not rule on the due process issues, and thus had no ruling to reverse on this point in *Evans II.* Likewise, it is clear that both parties agreed to settle the due process issues, as set forth in detail in the consent decree.[3] Therefore, the City's assertion that the judgment upon which the consent decree was based has been reversed

is not completely correct as there was no judgment on the due process issues. The Court understands the City's point that since it lost on the equal protection claim, it felt it had no choice but to settle the case. Nevertheless, the City did have a choice in how it structured the settlement and it could have reserved some or all of the due process issues for further litigation. The City lost on the equal protection claim, predicted it would lose on the due process claims if it pursued the matter, and decided the wisest course was to enter into the consent decree. At the time the consent decree was entered into no one could have very well predicted that, as a result of additional evidence before the district court during the trial on damages, the equal protection holding would be appealed and reversed. As a result, although the City is bound by the decree, it is no longer obligated to pay damages to several large classes of plaintiffs since the damages award, based on the equal protection holdings, was reversed in *Evans II.*[4]

This Court can find no competent basis for vacating the decree in its entirety and finds that Judge Grady's modification of the decree is a proper resolution of the conflict arising out of this Court's reversal of the equal protection holdings. Although the City argues that Ill.Rev.Stat. ch. 85, para. 9–104(a) can withstand both substantive and procedural due process challenges, the constitutionality of § 9–104(a) is not properly before this Court. Furthermore, the City cannot now litigate an issue that was subsumed in the consent decree, which the City agreed was final and applicable to it. *Money Store, Inc. v. Harriscorp Finance, Inc.,* 885 F.2d 369 (7th Cir.1989).

The City argues that the district court erred in modifying the consent decree to reflect the narrowest possible reading of this Court's prior decisions. However, as discussed above, in the absence of a judgment

---

**3.** At oral argument, the Court queried whether the agreement the parties entered into was a consent decree or, rather, simply an agreement on relief after a judgment on the merits. Counsel for both parties assured the Court that the agreement was indeed a consent decree. After further considering the issue, the court agrees that the document is a consent decree since there was not a judgment on the merits on the due

process claims. The due process claims were settled in the consent decree.

**4.** Neither party appealed the district court's finding that it need not reach the question of whether plaintiffs were entitled to damages based upon a due process violation.

on the due process issues, the district court had no other choice. The district court correctly granted relief from the consent decree to the extent that *Evans II* overruled *Evans I* on the equal protection holding.

The City also condemns the district court's decision by stating that a federal judgment still has effect even though it has not been shown that any law has ever been violated. The Court observes that this is true in most cases that settle. Most judgments arising from settlements are based on the agreement of the parties and not on a showing that a law has been violated. The purpose of a settlement agreement, or a consent decree, is to end a case without having to go through the trouble and expense of deciding whether a law has been violated. If the City had entered a consent decree prior to any litigation, thereby aborting the birth of *Evans I* and its siblings, the City would remain bound by the decree, absent a substantial change in legal or factual circumstances, even though it may later have believed that it unwisely entered into the decree. The City further complains that, by refusing to vacate the consent decree, the district court penalized it for having agreed to the entry of the decree rather than proceeding with litigation. Yet this is true in every case that settles—one party is being penalized in the sense that there is always the chance that one side can completely win their case if litigation continues.

Although we agree that consent decrees should be modified or vacated when the circumstances so warrant, we are mindful of the teaching of our Supreme Court in *Rufo,* — U.S. at ——, 112 S.Ct. at 760, that "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree." Further, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree" and then "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* In the present case, the significant change in cir-cumstances was a legal change rather than a factual change. The legal change was the ruling that the City's practice of paying tort judgments less than $1000 prior to judgments over $1000 did not violate the equal protection clause. The district court modified the decree to provide that the City could pay a tort judgment under $1000 in any order it wished. This modification is clearly suitably tailored to the changed circumstance. It is worth noting that Judge Grady gave the parties ample opportunity to submit an agreed upon proposed order modifying the decree. The City was apparently unable to reach an agreement and should not now complain so loudly that Judge Grady's modification is too narrow. Further, although the City is bound to the due process aspects of the consent decree, the procedures the City must follow in paying judgments have not been adjudged to be illegal. This is in keeping with the Supreme Court's ruling that a decree modification must not "create or perpetuate a constitutional violation." *Rufo,* —— U.S. at ——, 112 S.Ct. at 763. *Rufo* further held that:

A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor. Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires. The court should not "turn aside to inquire whether some of [the provisions of the decree] upon separate as distinguished from joint action could have been opposed with success if the defendants had offered opposition." [*U.S. v.*] *Swift,* [*& Co.*], 286 U.S. [106], at 116–117, 52 S.Ct. [460], at 463[, 76 L.Ed. 999 (1932) ].

*Id.* at ——, 112 S.Ct. at 764.

The City suggests to the Court that "to encourage settlements, a court considering changes in legal circumstances should construe them to be far-reaching changes, and thus grant relief from consent decrees freely," and that "to allocate the risk of future changes in the law to the obligor under a consent decree, without realistic hope of relief, is to discourage potential obligors from

entering into settlements in the first instance." The City is grossly overstating the case. First of all, it would be an extremely poor judicial policy to freely grant relief from consent decrees and certainly would not encourage settlements. Secondly, there has been no change in the law to which the City has not been granted relief. The decree has already been modified to account for the change in the law and the City has been relieved from paying damages.

The City relies on the following passage from *Rufo* in support of its argument that the federal courts should relinquish control over the management of the City's fisc:

> Within these constraints, the public interest and "[c]onsiderations based on the allocation of powers within our federal system," [Board of Educ. of Oklahoma City Public Schools v.] Dowell, 498 U.S. [237], at [238], 111 S.Ct. [630], at 632 [112 L.Ed.2d 715 (1991)], require that the district court defer to local government administrators, who have the "primary responsibility for elucidating, assessing, and solving" the problems of institutional reform, to resolve the intricacies of implementing a decree modification. *Brown v. Board of Education,* 349 U.S. 294, at 299, 75 S.Ct. 753 at 755–756, 99 L.Ed. 1083 (1955). See also *Missouri v. Jenkins,* 495 U.S. 33, 50, 110 S.Ct. 1651, 1662, 109 L.Ed.2d 31 (1990); [Milliken v. Bradley] Milliken II, 433 U.S. [267], at 281, 97 S.Ct. [2749], at 2757 [53 L.Ed.2d 745 (1977)]. (Footnote omitted.) Although state and local officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation, a court should surely keep the public interest in mind in ruling on a request to modify based on a change in conditions making it substantially more onerous to abide by the decree. To refuse modification of a decree is to bind all future officers of the state, regardless of their view of the necessity of relief from one or more provisions of a decree that might not have been entered had the matter been litigated to its conclusion.

*Id.*

It is clear to this Court that to continue to require the City to abide by the terms of the consent decree will not work a hardship on the City. The City admits that it has fully complied with the consent decree for eight years and has no intention of reverting to its prior practices, as it does not wish to ever again pay more post-judgment interest on its tort judgments than is absolutely necessary. The City argues that the interests of the taxpayers of the City of Chicago should also be considered in determining where the public interest lies, and their interests may not always dictate immediate payment. The City seems to have forgotten that the consent decree is very flexible and provides that:

> 6. Nothing in this decree is intended to prevent the parties to a suit from entering into a structured settlement, or a final settlement which assumes periodic payment of sums of money over a period of time established by the settlement, provided that such settlement is in good faith compliance with the terms of this Consent Decree and subject to the approval of the court before whom the case is pending.

> \* \* \* \* \* \*

> 12. In the event that all funds allocated for the payment of tort judgments have been exhausted, the time restrictions of paragraph 10 with respect to payment of tort judgments shall be suspended until such funds become available. All other provisions in paragraph 10 shall remain in full force and effect. When additional allocated funds become available for payment of tort judgments, all judgments due to be paid during the suspension period for which the proper documentation has been provided shall be paid immediately.

This flexibility fatally undermines the City's argument that the decree should be vacated because it robs the local government of necessary flexibility. For example, pursuant to Paragraph 6 above, if the City cannot afford to immediately pay a judgment in full, it may settle for whatever the judgment holder is willing to accept, such as higher interest. This alternative is certainly more justifiable than expecting the judgment holder to settle for less than he is entitled to (if he sells his judgment at a discount) or forego payment for years.

The City has suggested that if the Court finds vacatur of the decree unwarranted, the Court should remand the case back to the district court for a decision on the merits of the due process claims. The Court rejects this suggestion for two reasons. First, this case has been in Judge Grady's court since

November of 1977 and Judge Grady has conscientiously managed the case since that time. A review of the record in this case proves without a doubt that Judge Grady understands the case better than anyone else. His order modifying the decree conforms with the law, and while it may be argued until the end of time that *Evans II* could be read more broadly than Judge Grady chose to read it, by no stretch of the imagination can his decision be held to be an abuse of discretion. Second, a remand is likely to give rise to *Evans IV*, and possibly to *Evans V*, if plaintiffs continue to pursue their claim for attorney fees. Simply stated, this case should come to an end as soon as possible.

Accordingly, for all the foregoing reasons, the District Court's opinion is hereby AF-FIRMED.

EASTERBROOK, Circuit Judge, dissenting.

In 1982 we held that the sequence in which Chicago paid tort judgments against it violated the equal protection clause of the fourteenth amendment. On remand in 1983 the parties agreed on the prospective relief required by that decision but not on damages. On appeal from the damages judgment in 1989, we overruled our 1982 opinion. Chicago asked to be relieved of the prospective relief as well, now that its foundation is gone. A majority of this third panel holds that Chicago is forever bound to carry out relief designed to implement our overruled decision. This carries respect for the dead hand of the past altogether too far. Having admitted in 1989 our mistake of 1982, we should relieve the parties of the consequences.

**I**

During the late 1970s and early 1980s, the rate of interest Chicago paid on judgments (6% per annum for municipal governments, Ill.Rev.Stat. ch. 110 ¶ 2–1303) was substantially less than the cost of voluntary credit. Judgment debtors had every reason to postpone payment as long as this imbalance persisted. Instead of borrowing in the market at 15%, or raising taxes, Chicago borrowed from its judgment creditors. It paid tort judgments of $1,000 or less, and all contract judgments, quickly. Any plaintiff "lucky" enough to recover more in tort litigation could whistle for his money. By 1979 plaintiffs without the political clout to jump the queue had to wait on average 47 months for payment. An active secondary market in judgments against Chicago developed. About 80% of judgment holders sold in this market, accepting a discount of approximately 25% off the face value of their awards. *Evans v. Chicago*, 689 F.2d 1286, 1290 (7th Cir.1982) (*Evans I*).

The district court held that Chicago's practice of paying small judgments quickly while deferring payment of larger tort judgments violated the due process and equal protection clauses of the fourteenth amendment: due process because it deprived judgment holders of a "property" interest in immediate payment created by state law, and equal protection because there was no rational basis for distinguishing large from small awards. A panel of this court affirmed the portion of the judgment that rested on the equal protection clause, *id.* at 1299–1300, while vacating the due process aspect as premature, *id.* at 1296–99. Dicta in the opinion strongly imply that the City deprived the plaintiffs of due process of law, *id.* at 1297–98.

On remand the parties proposed, and the district court approved, a consent decree eliminating the distinction between large and small judgments, requiring all judgments to be paid in order of their entry, and providing that the Mayor must ask the City Council to appropriate enough money to pay all judgments promptly. The litigants could not agree whether the plaintiffs were entitled to damages for delay in payment. The district court concluded that they were, under the equal protection clause—both the plaintiffs and the district court deeming the due process theory surplusage in light of the equal protection holding. Another panel of this court reversed, overruling *Evans I.* 873 F.2d 1007 (7th Cir.1989) (*Evans II*). The second panel (with the acquiescence of the full court, see *id.* at 1008 n. *) concluded that the City had a rational basis, if only administrative convenience and the placation of the more numerous holders of small awards, to pay little judgments before big ones. *Id.* at 1015–18. The second panel wrapped up: "The district judge advanced some worthy ideas, but they are for the City's self-determination, and will not be imposed by this court. It is regrettable that this matter

which has lingered so long now takes a new and possibly unexpected turn, but what we now view as error must be arrested even at so late a date. Improvements in this situation are better left to the state and municipal governments." *Id.* at 1017–18.

Delay in paying judgments is no different in principle and in consequence from a low interest rate on judgments. If the statutory interest rate matches the market rate, judgment holders receive full compensation for delay and can sell judgments in the secondary market for their face value, just as people buy and sell 30–year municipal bonds. A court that would not dream of declaring, on constitutional grounds, that a 6% post-judgment interest rate is "too low" has no greater business declaring that the judgment debtor is taking "too long" to pay; the interest rate and the delay in payment are two facets of the same thing.

Chicago's practice has its legal problems, to be sure. Illinois law appears to forbid a city to put off its creditors as Chicago did. Ill.Rev.Stat. ch. 85 ¶ 9–104. Chicago's payment of contract before tort judgments may disfavor holders of federal judgments (most federal judgments against municipalities rest on 42 U.S.C. § 1983 and other civil rights statutes), which may offend the supremacy clause of the Constitution. And if Chicago pays interest on federal judgments at the local rate rather than the federal coupon issue yield equivalent rate, see 28 U.S.C. § 1961(a), then Chicago is in hot water under federal statutory law. Cf. *Evans II*, 873 F.2d at 1011 n. 7. But none of this has anything to do with the due process and equal protection clauses, notwithstanding the intimations in *Evans I* that by violating state law Chicago violated the due process clause. See *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944); *Archie v. Racine*, 847 F.2d 1211, 1215–18 (7th Cir.1988) (in banc).

Taking us up on the proposition in *Evans II* that "[i]mprovements in this situation are better left to the state and municipal governments", Chicago asked the district judge to vacate the injunction requiring sequential payment of judgments and compelling the Mayor's budget to include the funds for their prompt satisfaction. Rule 60(b)(5) of the Rules of Civil Procedure speaks directly to the situation, permitting relief from judgment when "a prior judgment upon which it

is based has been reversed or otherwise vacated". The injunction was based on *Evans I*, which has been overruled. Interest rates too have changed; today the legal rate approximates the market rate, so Chicago pays promptly. Still, it wants to redeem its governmental powers, now in hock in a district court.

Judge Grady, who has presided over this case since its inception, refused to vacate the decree. He conceded that *Evans II* pulled the rug out from under the equal protection theory. But, the judge observed, *Evans II* did not address the due process theory, deeming it abandoned, 873 F.2d at 1012 n. 11, 1018 n. 15. The consent decree did not specify a legal foundation and therefore did not rule out the possibility that Chicago was compromising the due process claim rather than yielding to the equal protection holding of *Evans I*. So after making a trivial change in the decree the judge reiterated that the City remains obliged to pay all judgments in order, and quickly. (The change the judge made, knocking out the portion of the decree forbidding Chicago to distinguish judgments according to size, is nugatory because of the separate provision in the injunction compelling the City to pay judgments strictly in order of their entry.)

## II

Chicago has prevailed on the merits of this case, and still it loses. An injunction intrudes into the internal operations of the City, telling the Mayor what items must be in the annual budget. *Evans II* said bluntly that, although changes may be beneficent, the political rather than the judicial process is responsible for the subject. The district court nonetheless held, and a majority of this third panel agrees, that the judicial compulsion may continue. How can this be? Recently the Supreme Court told district judges that they must reexamine consent decrees when changes in the legal landscape erode their footings. *Rufo v. Inmates of Suffolk County Jail*, —— U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Here we have not a change in legal doctrine with uncertain effects on the case at hand, but the overruling of the decision in this very case. The decree was founded on a blunder committed by this court. *Evans I* has been overruled, yet through the injunction *Evans I* lives on.

If the plaintiffs' due process claim really were independent of their equal protection

claim, and if the parties really settled the case rather than settling their disagreement about the injunctive relief to which *Evans I* entitled the plaintiffs, then there would be reason to think the consent decree *Rufo*-proof. The majority never discusses the first of these conditions, and it addresses the second only in a footnote. Footnote 3 asks whether the injunction was based on a consent decree; answering "yes," my colleagues think the inquiry over. Yet the question is not whether there was a "consent decree." Surely there was. The question is what aspects of the decree rest on the parties' consent rather than *Evans I*. No one believes that the decree settled "the case." Plaintiffs wanted damages. The City refused to pay, and after issuing an injunction the district judge held a trial on damages. Chicago appealed from an adverse decision, leading to *Evans II*. No, there was no global settlement. What issues, then, did the parties compromise? All the decree addresses is prospective relief. And this is all the parties settled—the relief, not the merits. Chicago "agreed" to do what *Evans I* implied that it must do. "'Consent' that is no more than knuckling under to the inevitable is more like an adjudication than a contract." *People Who Care v. Rockford Board of Education*, 961 F.2d 1335, 1338 (7th Cir.1992), quoted in *United States v. Chicago*, 978 F.2d 325, 333 (7th Cir.1992). Once again consider the significance of *Evans II*. If the parties indeed compromised the merits, what was the City doing asking us to overrule *Evans I?* Plaintiffs did not contend that through the consent decree Chicago bargained away its right to challenge the legal foundations of their position. If, as *Evans II* demonstrates, there has been no settlement of the merits, then nothing inhibits the court from erasing all vestiges of *Evans I*.

All that remains is the possibility that the due process theory is independent of the equal protection theory, so that *Evans II* does not undermine one sufficient theory for relief—a theory on which the parties may have reached a compromise. It makes sense to understand the decree as a settlement of a due process claim only if that claim supported additional relief, for otherwise it was superfluous. If *Evans I* sufficed to condemn the City's approach to paying judgments, the parties had no need to settle the due process claim. They could ignore it—because the judge was *legally bound* to ignore it! Once a decision on one claim resolves the case, a judge has no business under Article III of the Constitution issuing advisory opinions about additional legal theories. If the judge would not, *could not*, adjudicate a claim, and would award identical relief with or without that claim, it is foolish to treat a consent decree as resolving or resting on, let alone settling, that claim.

Judge Grady told the parties in no uncertain terms that *Evans I* resolved the merits, and that nothing remained but to select the appropriate relief. When Chicago bridled, the judge announced from the bench on October 26, 1983:

> Now, I have got to have an order from the City and the plaintiffs. I have got to have an agreed order that will bind the City to pass a budget sufficient to pay tort judgments.
>
> \*   \*   \*   \*   \*   \*
>
> If by November 25th, approximately a month from now, I do not have in my hands an agreed order that calls upon the City and requires the City to budget annually an amount sufficient to pay tort judgments along the lines which we have been discussing in great detail at our recent and not so recent conferences in chambers, then I am going to go ahead and enter my own order.
>
> \*   \*   \*   \*   \*   \*
>
> I see no need for any further conferences with counsel that go to basic philosophy or go to what I have been saying this afternoon. If there is some mechanical thing you want to talk about that I can help you with, I will be happy to sit down, but just to rehash this question about whether we are going to do something in this case that the Court of Appeals ordered done a long time ago, the time for discussion has passed.

Judge Grady unequivocally told the parties that *Evans I* compelled Chicago to appropriate the money to pay all judgments promptly—that *Evans I* dictated *what* to do, but not *how*. Only mechanical details remained for decision. And the details of prospective relief are all the parties compromised. The merits were not settled. They were litigated, twice. The City lost in *Evans I* and won the rematch in *Evans II*.

**1406**

Plaintiffs themselves saw things that way until recently. During the trial on damages, plaintiffs jettisoned their due process theory. When Chicago appealed from the award of damages, plaintiffs did not urge the due process theory in defense of their judgment. That is why we remarked in *Evans II* that the "due process claim has not survived to this stage of the litigation." 873 F.2d at 1018 n. 15. At oral argument before this third panel, counsel for the plaintiffs said that he let the due process theory drop because it was redundant.

If neither plaintiffs nor the district court attached any independent significance to the due process theory, if both believed that *Evans I* compelled Chicago to pay all tort judgments promptly, then it is unwarranted for us to proclaim that Chicago, unbeknownst to its own officials, "settled" this fugitive claim in 1983, putting the injunction beyond recall.

Lightning bolts of this kind disserve principles of federalism and in the long run work against the interests of the judicial system itself. In the future, prudent counsel will insist on litigating stray issues, lest an appellate court a decade later declare that in recognizing that a claim no longer mattered counsel sabotaged his client's rights. Or perhaps counsel will lard consent decrees with reservations and provisos, "clarifying" what is being settled and what is not, even though nothing then is in need of clarification. Worst of all, we might induce counsel to refuse to compromise on relief, lest such compromises be deemed to include the merits. Can you imagine Judge Grady's reaction if on November 25, 1983, Chicago's lawyers had told him that the City was refusing to accept relief of any kind, because it feared that this step would keep the Mayor and City Council in shackles if the law should change in the future?

Counsel seeking to maximize the City's ability to capitalize on legal developments might have done one of these things. Whatever the penalty for counsel's drafting choices should be, it is not a perpetual transfer of budgetary powers from state and local government to federal court. In treating this consent decree the same way they would treat the compromise of a private dispute over a contract to deliver two tons of rhubarb, the majority not only perpetuates the error of *Evans I* but also offends principles separating political from judicial roles in government.

Before: BAUER, Chief Judge, CUMMINGS, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ILANA DIAMOND ROVNER, Circuit Judges, WILLIAM C. LEE, District Judge.*

ORDER

Aug. 19, 1993.

On consideration of the petition for rehearing with suggestion for rehearing *en banc* filed in the above-entitled cause by the defendant-appellant on June 24, 1993 and the response thereto, a vote of the active members of the court was requested and a majority of the judges in active service voted to grant a rehearing *en banc.* Accordingly,

IT IS ORDERED that the aforesaid petition for rehearing with suggestion for rehearing *en banc* be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that the judgment and opinion entered in this case on June 3, 1993 be, and are hereby, VACATED. This case will be reheard *en banc* at the convenience of the court.

---

* The Honorable William C. Lee, United States District Judge for the Northern District of Indiana, was a member of the original panel but took no part in the vote on the suggestion for rehearing *en banc.*