96 F.3d 890
 112 Ed. Law Rep. 651
 In the Matter of The Application of COUNTY COLLECTOR OF the
COUNTY OF WINNEBAGO, ILLINOIS,
Appeal of Michael F. O'BRIEN, Alice J. O'Brien, Edward M.
Maher, et al.
 Nos. 96-1709, 96-1710 and 96-1716.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 7, 1996.
Decided Sept. 16, 1996.
Rehearing Denied Oct. 22, 1996.
 
 Michael F. O'Brien (argued), McGreevy, Johnson & Williams, Rockford, IL, for appellants Michael F. O'Brien, Alice J. O'Brien, Edward M. Maher, Raymond E. Johnson, Mid-America Asset Management, Christine J. Hawley, Roger D. Eggert, Lowes A. Eggert.
 Lawrence J. Weiner (argued), Anthony G. Scariano, Rosanne Ciambrone, Justino D. Petrarca, Johnathan A. Pearl, Scariano, Kula, Ellch & Himes, Chicago, IL, John N. Schmidt, William J. Quinlan, Rockford Public Schools, Rockford, IL, for appellee Rockford Bd. of Educ., School Dist. No. 205 in No. 96-1709.
 Lawrence J. Weiner (argued), Anthony G. Scariano, Rosanne Ciambrone, Justino D. Petrarca, Scariano, Kula, Ellch & Himes, Chicago, IL, William J. Quinlan, Rockford Public Schools, Rockford, IL, for appellee Rockford Bd. of Educ., School Dist. No. 205 in No. 96-1710.
 Lawrence J. Weiner (argued), Anthony G. Scariano, Rosanne Ciambrone, Justino D. Petrarca, Scariano, Kula, Ellch & Himes, Chicago, IL, John N. Schmidt, Rockford Public Schools, Rockford, IL, for appellee Rockford Bd. of Educ., School Dist. No. 205 in No. 96-1716.
 Before POSNER, Chief Judge, and FLAUM and RIPPLE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 Appellants (the "tax objectors") filed tax objections in Illinois state court, claiming that the Rockford Board of Education, School District No. 205 (the "school district"), levied taxes against their property in violation of Illinois law. The taxes were levied as a result of a federal lawsuit against the school district alleging racial discrimination. In that suit, the school district agreed to, and the district court approved, a consent decree that sought to remedy racial imbalance in the Rockford schools. The consent decree authorized the school district to fund remedial programs by levying taxes under the Illinois Local Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 et seq. (the "Tort Immunity Act"). The tax objectors contended in state court that the Tort Immunity Act did not provide the school district with authority to levy taxes to finance the remedial measures contained in the consent decree. The school district intervened in the tax objection proceedings and promptly removed the cases to district court. The objectors then moved to remand the tax objections to state court, asserting that the district court lacked jurisdiction over what were essentially state law cases. The district court held that, because the state tax cases could effectively frustrate the school district's implementation of the consent decree entered in the discrimination lawsuit, the cases were properly removed under the Civil Rights Removal Statute, 28 U.S.C. § 1443, and the All Writs Act, 28 U.S.C. § 1651(a). On the merits of the tax objections, the district court concluded that the Tort Immunity Act authorized the disputed levies. We conclude that because the district court lacked jurisdiction over the state law tax objections, the tax cases must be remanded to state court, and we therefore reverse the district court's judgment.
 
 I.
 
 2
 The litigation that spawned the taxes at issue began in 1989, when a class-action complaint was filed in the case of People Who Care v. Rockford Board of Education, No. 89 C 20168 (N.D.Ill.) (the "PWC case"). The complaint alleged that the school district had violated the Equal Protection Clause of the Fourteenth Amendment by intentionally segregating and discriminating against students on the basis of race.[1] As the PWC case progressed, the parties entered into, and the district court approved, settlement agreements making interim provisions for various aspects of the Rockford school system implicated by the litigation. On April 24, 1991, the district court entered a consent decree known as the Second Interim Order, which called for the school district's adoption of certain remedial measures. The Second Interim Order specifically addressed the funding of these remedial measures and the ability of the school district to levy taxes under state law:
 
 
 3
 The District is subject to the provisions of the [Tort Immunity Act]. The Tort Immunity Act empowers and directs a local public entity such as the District to pay any liability imposed upon it for a tortious act under Federal or State common or statutory law or to pay any tort judgment or settlement for compensatory damages based on any injury caused by an alleged negligent or alleged wrongful act or omission of the local public entity. The Board of Education of the District may, if it considers the action advisable, issue general obligation bonds without referendum to pay such liability, judgment, or settlement. In addition thereto (or in the alternative), the District may pay for such recurring and continual incremental costs for such programs specified in this Order by additional levies in the District's Tort Immunity Fund. Pursuant to this Order, the District is mandated to fund the cost of the activities required herein.... This Court has considered the provisions of Article IX--Payment of Claims and Judgment--of the Tort Immunity Act and finds that the funding by the District of the cost of said activities constitutes and is the payment by the District of a liability, tort judgment or settlement that authorizes the issuance of the District's non-referendum general obligation bonds referred to in Section 9-105 of the Tort Immunity Act or the levying of an annual rate of tax in the District's annual levy for Tort Immunity purposes, to pay for annual and recurring program costs (other than the institution of capital improvements) as required by this Order.
 
 
 4
 The funding section of the Second Interim Order further provided that:
 
 
 5
 [T]he District has the responsibility for funding the activities required by all Sections of this Order. The parties and the Court have already taken possible financial constraints into consideration, and those matters have been allowed for in formulating the particular requirements of this Order. Accordingly, the District has discretion to determine what sources of funds shall be used for that purpose, but this discretion relates solely to the manner of funding the requirements of the Order.
 
 
 6
 At the time the Second Interim Order was entered, the school district had not admitted engaging in discrimination nor had the district court made a determination of liability.
 
 
 7
 To finance its obligations under the consent decree, the school district issued bonds and levied real estate taxes in 1991, 1992, and 1993 under the Tort Immunity Act. The taxes levied to pay for the Second Interim Order's equitable remedies represented a significant portion of the school district's annual revenues in those years.[2] The appellants paid these taxes under protest and annually filed tax objections in state court pursuant to Illinois statute.[3] The tax objectors alleged that the Tort Immunity Act did not grant the school district authority to levy the taxes at issue. Specifically, the tax objectors contended that the cost of complying with the prospective equitable relief mandated by the Second Interim Order did not constitute the payment of "compensatory damages," for which public entities are authorized to levy taxes under the Tort Immunity Act.[4]
 
 
 8
 In each tax objection proceeding, the school district quickly intervened and removed the case to federal district court. The tax objectors moved to remand each case, maintaining that the district court lacked subject matter jurisdiction over the three state law tax disputes. The school district argued before the district court that any relief granted by the state court in the three tax objection proceedings would effectively prevent the school district from fulfilling its mandatory responsibilities under the Second Interim Order. Following this characterization of the tax disputes, the school district advanced two bases for the district court's subject matter jurisdiction. First, the possibility of interference with the federal consent decree created a federal question, thereby providing the court with removal jurisdiction under 28 U.S.C. § 1441. Second, the school district in levying the taxes was carrying out the order of a federal court in a civil rights case, allowing for removal under the civil rights removal statute, 28 U.S.C. § 1443. The district court determined that the cases were properly removed under 28 U.S.C. § 1443 and that the All Writs Act, 28 U.S.C. § 1651(a), provided an independent basis of removal jurisdiction because the tax disputes could effectively frustrate the entire consent decree. Reaching the merits of the tax objections, the court granted summary judgment for the school district, holding that "compensatory damages" under the Tort Immunity Act includes the costs of complying with mandatory injunctive relief.
 
 
 9
 While the tax objections were pending before the district court, extensive evidence was presented in the PWC case regarding the liability of the school district under the Equal Protection Clause of the Fourteenth Amendment. On February 16, 1994, after all the taxes disputed in the current case had been levied, the district court found that the school district had unlawfully segregated and discriminated against students on the basis of race and ethnic origin. See People Who Care v. Rockford Bd. of Educ., 851 F.Supp. 905, 930-33 (N.D.Ill.1994). Based on this adjudication of liability, the district court, on March, 29, 1994, entered a Declaratory Judgment and Permanent Injunction Order enjoining the school district from "segregating or discriminating against its African-American and Hispanic students on the basis of their race, ethnicity or national origin" and directing the school district to "eliminate root and branch, throughout the Rockford public school system, all vestiges of racial, ethnic and national origin segregation or discrimination against African-American and Hispanic students." The parties and the court then worked to formulate a comprehensive remedial order, the final portion of which the district court entered on June 7, 1996, the same day oral argument was heard in this appeal.[5]
 
 II.
 
 10
 The consent decree is a unique construct in the legal realm. As a contract wrapped in a judgment, the consent decree has attributes of both. Thus, although a consent decree can casually be labelled a "contract" or a "judgment," one must closely examine the nature of the dispute to determine the implications of the agreement embodied in a consent decree. The parties in the PWC case agreed in the Second Interim Order that the school district had the capacity to levy taxes under the Tort Immunity Act to pay for the costs of complying with the equitable relief contained in that order. The district court, in approving the consent decree, concurred in the parties' understanding that the taxes were authorized by the Tort Immunity Act. It is clear that the tax objectors, who were not parties to the consent decree, are not bound by the consent decree and are entitled to their "own day in court" to challenge actions taken under the decree. Martin v. Wilks, 490 U.S. 755, 762, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989). But in what forum may such disputes be litigated? The question before us today is whether the court-approved agreement of the parties in the PWC case that the school district could levy the taxes under the Tort Immunity Act (and the district court's "finding" to that effect) permits the removal of the tax objections filed in state court challenging the school district's authority to levy the taxes. We conclude that the tax objections should be remanded to state court.
 
 
 11
 We begin with the fundamental principle that federal courts are courts of limited jurisdiction. All federal courts, excluding the Supreme Court, derive their jurisdiction from Congress' power under the Constitution to "ordain and establish" inferior courts. U.S. CONST. art. III, § 1; Lockerty v. Phillips, 319 U.S. 182, 187, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339 (1943); Abercrombie v. Office of Comptroller of Currency, 833 F.2d 672, 674 (1987). Removal jurisdiction is therefore completely statutory, and we cannot construe jurisdictional statutes any broader than their language will bear. Cook v. Weber, 698 F.2d 907, 909 (7th Cir.1983). The party seeking removal has the burden of establishing the jurisdiction of the district court, Wellness Community-National v. Wellness House, 70 F.3d 46, 49 (7th Cir.1995), and we review the propriety of removal de novo. Seinfeld v. Austen, 39 F.3d 761, 763 (7th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1998, 131 L.Ed.2d 1000 (1995).
 
 A.
 
 12
 The school district asserts that the district court possessed jurisdiction under 28 U.S.C. § 1441(a), which provides for the removal of cases within the original jurisdiction of the district courts.[6] As there is no diversity of citizenship between the parties in this case, we need only examine whether the tax objections fall within the original "federal question" jurisdiction of the district courts. Federal question jurisdiction exists if the actions "aris[e] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. To determine the presence or absence of federal question jurisdiction, we generally look no further than the allegations contained in the plaintiff's "well-pleaded complaint." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987); Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 9-10, 103 S.Ct. 2841, 2846-47, 77 L.Ed.2d 420 (1983). Correspondingly, "a case may not be removed to federal court on the basis of a federal defense...." Caterpillar, 482 U.S. at 393, 107 S.Ct. at 2430. The Supreme Court in Franchise Tax Board identified three situations where a case could "arise under" federal law. First, a suit obviously arises under federal law if the plaintiff's cause of action is created by federal law. Id. at 8-9, 103 S.Ct. at 2845-46. However, where state law creates the plaintiff's cause of action, there is no federal question jurisdiction unless "some substantial, disputed question of federal law is a necessary element ... of the well-pleaded state claim[ ]" or the "claim is 'really' one of federal law." Id. at 13, 103 S.Ct. at 2848.
 
 
 13
 It is undisputed that the well-pleaded complaint of the tax objectors presents a state law cause of action. Moreover, the school district has failed to demonstrate that the tax objectors' "right to relief necessarily depends on resolution of a substantial question of federal law." Id. at 27-28, 103 S.Ct. at 2856. The only question presented in this case is whether Illinois law, specifically the Tort Immunity Act, authorized the school district to levy the taxes at issue. The tax objectors' right to recovery is completely dependent upon the proper construction of the Tort Immunity Act, i.e., whether the costs of complying with the equitable relief mandated by the Second Interim Order constitute "compensatory damages" under the Act. The school district could not expand its authority to levy taxes by entering into the consent decree. See, e.g., Kasper v. Bd. of Election Comm'rs of City of Chicago, 814 F.2d 332, 341-42 (7th Cir.1987) ("A consent decree is not a method by which state agencies may liberate themselves from the statutes enacted by the legislatures that created them."). Because the parties to a consent decree "cannot consent to do something together that they lack the power to do individually," Perkins v. City of Chicago Heights, 47 F.3d 212, 216 (7th Cir.1995), the consent decree does not even potentially inject a federal law issue into this case.[7]
 
 
 14
 Federal question jurisdiction also exists over a state law claim if the claim is "really" one of federal law. Franchise Tax Bd., 463 U.S. at 13, 103 S.Ct. at 2848. While a plaintiff is generally free to choose whether to rely on state or federal law, "it is an independent corollary of the well-pleaded complaint rule that a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." Id. at 22, 103 S.Ct. at 2853. Under this "independent corollary" of the well-pleaded complaint rule, also known as the "artful pleading" doctrine, courts will look beyond a plaintiff's characterization of a claim to determine whether the claim truly arises under federal law. See, e.g., Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424 n. 2, 2427, 69 L.Ed.2d 103 (1981); Doe v. Allied-Signal, Inc., 985 F.2d 908, 911 (7th Cir.1993); Burda v. M. Ecker Co., 954 F.2d 434, 438 (7th Cir.1992); United Jersey Banks v. Parell, 783 F.2d 360, 367 (3d Cir.1986). Courts have recognized, however, that an expansive application of this doctrine would allow the artful pleading "exception" to swallow the well-pleaded complaint rule. See Her Majesty the Queen v. City of Detroit, 874 F.2d 332, 340 (6th Cir.1989); United Jersey Banks, 783 F.2d at 368.
 
 
 15
 The school district maintains that the tax objections "really" arise under federal law because the actions could potentially interfere with the federal consent decree. Yet the artful pleading doctrine is not a mantra that, through simple invocation, will transform a plaintiff's state law claim into one arising under federal law. Indeed, this case is a far cry from the typical application of the doctrine, where federal law exclusively occupies the entire field in which a plaintiff's purported state law claim is brought. Since, in that scenario, the conduct complained of is necessarily governed by federal law, the claim arises under federal law, regardless of the plaintiff's characterization. See, e.g., Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists, 390 U.S. 557, 560, 88 S.Ct. 1235, 1237, 20 L.Ed.2d 126 (1968) (suit to enforce collective bargaining agreement arises under § 301 of Labor Management Relations Act, which completely preempts state law applicable to such agreements); Graf v. Elgin, Joliet & E. Ry. Co., 790 F.2d 1341, 1345-46 (7th Cir.1986) (railroad worker's claim of wrongful discharge arises under collective bargaining provisions of Railway Labor Act). In that type of situation, we have described the plaintiff's claim as "a federal case in state wrapping paper." See Graf, 790 F.2d at 1344. As this description implies, before we will apply the artful pleading doctrine, we must be able to recharacterize the state law claim as a federal cause of action. See Franchise Tax Bd., 463 U.S. at 25-27, 103 S.Ct. at 2854-56 (limiting Avco's holding to cases where federal law supplies a cause of action that completely preempts state law claims); Ultramar Am. Ltd. v. Dwelle, 900 F.2d 1412, 1415-16 (9th Cir.1990)[8]. In the present case the tax objectors filed suit in state court, alleging that the taxes violated state law and requesting a refund. There was no similar federal cause of action for the tax objectors to pursue. Because the tax objectors could not have presented their claims in a federal forum, we can only conclude that they did not attempt to avoid federal court through artful pleading. Contrary to the school district's position, a state law claim does not present a federal question merely because it adversely impacts the terms of a federal consent decree.[9] Section 1441(a) therefore provides no basis for the removal of the tax objections to federal court.
 
 B.
 
 16
 We next turn to the "color of authority" clause of the civil rights removal statute, 28 U.S.C. § 1443(2), which authorizes a defendant[10] to remove civil actions or criminal prosecutions for "any act under color of authority derived from any law providing for equal rights." In Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), the Supreme Court held that individual citizens who were prosecuted for exercising what they claimed were constitutionally protected rights could not remove their cases under § 1443. After an extensive examination of the statute's language and legislative history, the Court found that the color of authority clause is "limited to enforcement activity by federal officers and those acting under them." Id. at 823, 86 S.Ct. at 1810. The Court therefore concluded that the clause "confers a privilege of removal only upon federal officers or agents and those authorized to act with or for them in affirmatively executing duties under any federal law providing for equal civil rights." Id.
 
 
 17
 The school district maintains that, in levying the taxes, it was acting pursuant to the terms of the Second Interim Order and thereby "affirmatively executing duties" under a federal civil rights law. In support of its position, the school district relies on our decision in Burns v. Board of School Commissioners, 437 F.2d 1143 (7th Cir.1971), aff'g 302 F.Supp. 309 (N.D.Ind.1969). The defendant school board in Burns had been found by the district court in a separate case to have segregated students in violation of the Equal Protection Clause. To remedy the constitutional violation, the court ordered the school board to transfer teachers between various schools. Three teachers then filed suit in state court to enjoin the school board from transferring teachers, alleging that the transfers violated state and federal law. We adopted the district court's opinion, which held that the defendant school board could invoke the color of authority clause to remove the state court action. 437 F.2d at 1144, 302 F. Supp. at 312. The district court reasoned that the school board was ordered to act for a federal officer (the court) in affirmatively executing duties under a federal law providing for equal civil rights. 302 F.Supp. at 312. Other courts have similarly found that defendants sued for acts taken pursuant to court-ordered school desegregation plans are entitled to remove under the color of authority provision, as construed in Greenwood. See, e.g., Bohlander v. Independent Sch. Dist. Number One, 420 F.2d 693, 694 (10th Cir.1969); Voinovich v. Cleveland Bd. of Educ., 539 F.Supp. 1100, 1101-02 (N.D.Ohio 1982); Buffalo Teachers Fed'n v. Board of Educ. of City of Buffalo, 477 F.Supp. 691, 693-94 (W.D.N.Y.1979).
 
 
 18
 Despite the school district's arguments to the contrary, Burns does not extend so far as to permit removal in this case.[11] The district court in Burns specifically ordered the school board to transfer teachers, and the board was thereby authorized to act for the court in affirmatively executing duties under a civil rights law. The suit to enjoin the transfer of teachers was therefore removable under the color of authority clause. In contrast to Burns, the school district in the current case was not explicitly ordered to take the actions for which it was sued. Of course, a court does not often spell out, in minute detail, each step that a party needs to follow to satisfy the court's order. In addition to having a duty to follow the specific directives of the court, a party may fairly be said to have an ancillary "duty" to take those actions that are necessary to comply with the explicit commands of the court.[12] Thus, a defendant sued for acts explicitly mandated or necessarily required by court-ordered school desegregation plans can remove under the color of authority clause. See Armeno v. Bridgeport Civil Serv. Comm'n, 446 F.Supp. 553, 557 (D.Conn.1978) (finding that injunction phrased in negative terms may "effectively impel[ ] the defendant to act in virtually only one way," and that in such circumstances defendant may be authorized to act for court in affirmatively executing duties). But where the plaintiff complains of actions that were collateral to, rather than necessary concomitants of, the defendant's specific obligations under a court order, the defendant cannot claim that it was sued for affirmatively executing court-ordered duties and remove under § 1443(2). See, e.g., Massachusetts Council of Constr. Employers, Inc. v. White, 495 F.Supp. 220, 221-22 (D.Mass.1980); Tucker v. Cleveland Bd. of Educ., 465 F.Supp. 687, 689 (N.D.Ohio 1979).
 
 
 19
 After carefully reviewing the terms of the Second Interim Order, we conclude that the order did not require the school district to levy the taxes at issue in this case. Although the order directed the school district to fund remedial programs, it explicitly left the manner of funding the remedial relief completely in the discretion of the school district. Indeed, the order states that "the [school district] has discretion to determine what sources of funds shall be used for [the required relief]." To be sure, the parties to the consent decree agreed, and the district court found, that the school district could levy the taxes under the Tort Immunity Act. The school district maintains that the district court's finding that the taxes were authorized under the Tort Immunity Act "effectively compelled" the school district to levy the taxes using the Act. Yet the district court's finding was just that--a finding. In making this determination the district court was merely fulfilling its obligation to ensure that, in its judgment, the consent decree did not violate state law. See, e.g., Perkins, 47 F.3d at 216. The district court's observation and conclusion as to the legality of the levies under the Tort Immunity Act simply cannot be read as an order compelling the school district to impose taxes under the Act. Furthermore, there is absolutely no evidence in the record before us indicating that the school district would be unable to implement any of the remedial programs required by the Second Interim Order without the use of Tort Immunity funds. Because the school district has the burden of establishing the district court's jurisdiction, we should not speculate in this regard. While the school district undoubtedly levied taxes under the Tort Immunity Act in an effort to comply with the Second Interim Order, the order in no way mandated the school district to engage in the particular conduct of which the tax objectors complain. Therefore, in levying the taxes, the school district cannot be said to have been "affirmatively executing duties" under a federal civil rights law. Greenwood, 384 U.S. at 824, 86 S.Ct. at 1810.
 
 
 20
 Even if we were to agree with the school district that the Second Interim Order required it to levy the taxes under the Tort Immunity Act, the tax objections would not be removable under the color of authority clause for an independent reason. The plaintiffs in the PWC case filed their suit under the Equal Protection Clause of the Fourteenth Amendment, which is clearly a federal law providing for equal civil rights. Before any finding of liability in the PWC case, the parties agreed on various matters, and the district court entered their agreement as an injunction--the Second Interim Order. We previously noted that the Second Interim Order, as a consent decree, is both a contract and a judgment. Yet the Supreme Court has clearly stated that "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." Firefighters Local No. 93 v. City of Cleveland, 478 U.S. 501, 522, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986) (emphasis added). This court has also recognized that the "source of authority to require ... parties to act [under a consent decree] remains their acquiescence rather than rules of law." People Who Care v. Rockford Bd. of Educ., 961 F.2d 1335, 1337 (7th Cir.1992); see Dunn v. Carey, 808 F.2d 555, 559 (7th Cir.1986).[13] Thus, the school district, in complying with the terms of the consent decree, was not carrying out duties "under a federal law providing for equal civil rights," but rather fulfilling obligations that it had agreed to undertake. The school district's voluntarily assumed actions under the consent decree simply cannot be legally equated with the enforcement of a federal civil rights law. Therefore, the color of authority clause can provide no basis for removal in this case. See Greenwood, 384 U.S. at 824, 86 S.Ct. at 1810.
 
 C.
 
 21
 As a final justification for removal, the school district relies on the All Writs Act, 28 U.S.C. § 1651(a), which provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The language of this statute, with lineage tracing back to the Judiciary Act of 1789, is both obscure and anachronistic. The Supreme Court has interpreted the Act to authorize a federal court to "issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." United States v. New York Tel. Co., 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977). This power is not limited to parties in the original action, but rather "extends, under appropriate circumstances, to persons who ... are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." Id. at 174, 98 S.Ct. at 373 (internal citations omitted). The Act, however, does not confer unlimited discretion on the federal courts:
 
 
 22
 The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling. Although that Act empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate.
 
 
 23
 Pennsylvania Bureau of Correction v. United States Marshals Serv., 474 U.S. 34, 43, 106 S.Ct. 355, 361, 88 L.Ed.2d 189 (1985).
 
 
 24
 The district court asserted removal jurisdiction over the tax objections based on the authority of Yonkers Racing Corp. v. City of Yonkers, 858 F.2d 855 (2d Cir.1988), cert. denied, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989). The district court in Yonkers, in an underlying lawsuit, had found the City of Yonkers liable for a pattern of deliberately concentrating public housing for the purpose of maintaining racial segregation and ordered the city to provide sites for 200 units of public housing in nonminority areas. Id. at 857-58. Under threat of contempt sanctions for noncompliance with the court's order, the City entered into a consent decree designating seven sites on which to build the public housing and requiring the City to initiate eminent domain proceedings, if necessary, to acquire the sites. Id. at 859. After condemnation proceedings on the plaintiffs' properties had been initiated by the City pursuant to the consent decree, the plaintiffs filed suit in state court, alleging that the City, in attempting to condemn their properties, had failed to comply with proper state law procedures. The Second Circuit found that the district court, "confronted ... with the need to vindicate the constitutional rights of those in Yonkers who have been denied fair housing," had the power under the All Writs Act to remove otherwise unremovable state court proceedings in exceptional circumstances, despite the existence of other statutes explicitly governing removal. Id. at 863-65. The Second Circuit determined that such exceptional circumstances existed in Yonkers because removal was necessary to prevent frustration of the consent decree, and the issues raised in the state proceedings were inseparable from the relief provided by the consent decree. Id. at 865.
 
 
 25
 The school district maintains that the current case is controlled by Yonkers, but we cannot agree. Rather, we believe our decision in Dunn v. Carey, 808 F.2d 555 (7th Cir.1986), the relevant facts of which are indistinguishable from today's case, is dispositive. The plaintiffs in Dunn filed a federal suit against local officials, claiming that conditions at their jail violated the United States Constitution. Before any finding of liability, the parties settled the case by entering into a consent decree, which called for the construction of new public buildings and required the levying of taxes to pay for the facilities. Non-parties to the consent decree then filed state tax protests, arguing that the local officials had bypassed state law procedures for the approval of public buildings and seeking an injunction against the assessment of taxes. The parties to the federal suit sought to enjoin the state litigation, alleging that an injunction was necessary to protect or effectuate the consent decree. We held in Dunn that the Anti-Injunction Act, 28 U.S.C. § 2283, prohibited the issuance of the requested injunction. Id. at 559-60.[14] In disposing of the claim that the injunction was necessary "to protect or effectuate" the consent decree, thus falling within the exception to the Anti-Injunction Act, we reasoned that:
 
 
 26
 [The tax protestors] were not parties in the federal case and are otherwise not directly bound by the federal decree. It follows that they may litigate in a forum appropriate to the nature of the claim.... The principles of comity that underlie [the Tax Injunction Act] and [the Anti-Injunction Act] call for allowing a state to decide for itself when and how disputes about the size and distribution of its taxes shall be settled. Indiana has created a forum in which arguments about taxation may be heard. The texts of the statutes to one side, it would take compelling circumstances to justify the displacement of this dispute into federal court
 
 
 27
 ...
 
 
 28
 Because a consent decree's force comes from agreement rather than positive law, the decree depends on the parties' authority to give assent.... Third parties, not even colorably bound by the decree, ... should be able to challenge the authority of the person assenting to the decree. Some rules of law are designed to limit the authority of public officeholders, to make them return to other branches of government or to the voters for permission to engage in certain acts. They may chafe at these restraints and seek to evade them; if they do, the people for whose protection the restraints were created are entitled to repair to the forums designed to hear arguments that officeholders have acted without authority.
 
 
 29
 Id. at 558-59 (emphasis added and internal citations omitted). Dunn stands for the proposition a state court suit challenging the authority of parties to a consent decree cannot interfere with a consent decree, for the validity of the decree is entirely dependent on the parties' authority to give assent. If a state court determines that a party lacked authority to agree to particular terms of a consent decree, those terms of the decree are without legal effect. Consequently, an injunction against the state court suit would not be necessary to protect or effectuate the consent decree. Our cases following Dunn have reiterated that parties generally "cannot consent to do something together that they lack the power to do individually." Perkins v. City of Chicago Heights, 47 F.3d 212, 216 (7th Cir.1995); see People Who Care v. Rockford Bd. of Educ., 961 F.2d 1335, 1337 (7th Cir.1992). Consent decrees can alter the state law rights of third parties only where the change is necessary to remedy a violation of federal law. Perkins, 47 F.3d at 216; People Who Care, 961 F.2d at 1339.[15]
 
 
 30
 Dunn and our other precedent discussing the legal effects of consent decrees strongly indicate that, in a case such as this where a consent decree was entered without findings of liability[16] or "necessity,"[17] the All Writs Act does not permit the removal of a third-party action claiming that a party to the consent decree acted without authority under state law. Cases (such as Dunn) under the Anti-Injunction Act can be extremely helpful in interpreting the All-Writs Act. See, e.g., In re Baldwin-United Corp., 770 F.2d 328, 335 (2d Cir.1985). In fact, the parallels between the two statutes are immediately apparent. The Supreme Court has found that the "in aid of jurisdiction" and the "to protect or effectuate judgments" exceptions in the Anti-Injunction Act are closely related concepts. Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970). Both exceptions imply that "injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Id. The language of the All Writs Act has been interpreted similarly to allow federal courts to issue commands "necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued...." New York Tel. Co., 434 U.S. at 172, 98 S.Ct. at 372. Thus, both Acts seek to prevent interference with the judgments of federal courts. Indeed, central to the analysis in Yonkers was the Second Circuit's conclusion that the district court could have enjoined the state court proceedings pursuant to the Anti-Injunction Act. 858 F.2d at 864.
 
 
 31
 Dunn held that the Anti-Injunction Act does not permit the enjoining of a third-party state court action challenging a party's authority to assent to a federal consent decree. It would therefore be highly inconsistent for us to decide that removing the same type of action is permissible under the All Writs Act.[18] We can discern no reason why these actions contesting the authority of officials under state law should be treated differently under the two Acts. The tax objections are state law disputes, and we have every confidence in the ability and objectivity of Illinois courts to decide the difficult state law issues that they present. If the Illinois courts determine that the taxes were lawful under the Tort Immunity Act, then the tax objectors will be denied recovery. But if the Illinois courts conclude that the Tort Immunity Act did not authorize the levying of the taxes, the tax objectors are entitled to recover; for the Illinois courts are the appropriate and ultimate arbiters of Illinois law, and the consent decree could not expand the school district's legal authority, at least without a finding of "necessity." Both comity and the inherently limited jurisdiction of the federal courts counsel against the removal of these suits, which the state courts are fully competent to decide. See Graf v. Elgin, Joliet & E. Ry. Co., 790 F.2d 1341, 1346 (7th Cir.1986) ("[A] state's own courts should be allowed to decide issues of state law arising in suits between citizens of that state.") We therefore must conclude that the All Writs Act does not permit the removal of third-party actions under state law disputing the authority of a party to a consent decree entered without liability or "necessity" findings.[19]
 
 
 32
 Even if we were to decide that the All Writs Act permits the removal of this type of action in certain circumstances, removal of the current tax objections would be unwarranted.[20] Yonkers authorizes removal only where necessary to prevent the frustration of federal court orders. 858 F.2d at 865. Despite the school district's assertions otherwise, we are not persuaded on the state of this record that the removal of the tax objections is necessary to prevent the frustration of the Second Interim Order. Again, we must emphasize that the Second Interim Order did not explicitly or implicitly compel the school district to levy taxes under the Tort Immunity Act. Rather, the consent decree explicitly gave the school district discretion to determine the source of funding for the relief it granted. Thus, we are not faced with a situation like that in Yonkers, where condemnation proceedings were initiated by the city under the specific direction of the consent decree and the state court suit directly challenged the propriety of the condemnations. Unlike in Yonkers, the state court proceedings in the current case are collateral to the relief provided by the consent decree. The Second Interim Order requires the school district to adopt various remedial programs, and, as the record now stands, we do not have a sufficient basis to conclude that the school district would be unable to implement the remedial measures without the use of Tort Immunity funds.[21] The All Writs Act, therefore, does not license the removal of the tax objections.
 
 III.
 
 33
 While we can appreciate the district court's diligent efforts to remedy the vestiges of discrimination in the Rockford school system, we cannot turn a blind eye to the jurisdictional requirements of the federal courts. The Second Interim Order, as a consent decree providing for equitable remedies, simply does not currently supply the district court with a jurisdictional hook on which to hang the collateral tax objections. The tax objections must therefore return to state court. We note, however, that the district court has retained jurisdiction over the PWC case and has entered the Comprehensive Remedial Order, which contains its own remedial measures and funding provisions. The district court has expressed its intention to adhere to Supreme Court precedent by formulating an order which both seeks to remedy the unconstitutional conditions and also endeavors to avoid unnecessary interference with the affairs of state and local authorities. See Missouri v. Jenkins, --- U.S. ----, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995). The Supreme Court has found that, in certain circumstances, federal courts may order school districts to levy taxes, despite state law limitations on their authority, where the taxes are necessary to remedy constitutional violations. See Missouri v. Jenkins, 495 U.S. 33, 57, 110 S.Ct. 1651, 1666, 109 L.Ed.2d 31 (1990). Federal law is supreme, and where a particular remedy is required to vindicate constitutional rights, a state cannot prevent a local government from implementing that remedy. Id. at 58, 110 S.Ct. at 1667. As of today, the district court has not ventured down this path, and we do not presume to guide it in this respect.
 
 
 34
 For the foregoing reasons, we REVERSE the district court's judgment with instructions to remand the tax objections to state court.
 
 
 35
 RIPPLE, Circuit Judge, dissenting.
 
 
 36
 In my view, removal of this action was permissible under the civil rights removal statute, 28 U.S.C. § 1443(2).
 
 1.
 
 37
 The court, although acknowledging that this court[1] and others[2] have permitted the removal of state cases that have threatened the implementation of a remedy in a civil rights action, holds that this authority cannot extend to the consent decree here because it did not explicitly order the school district to levy the taxes at issue. Indeed, the court notes that, had the district court explicitly required that the taxes be levied, our case law would permit removal under the statute. Thus, in the panel majority's view, only when a defendant is compelled to take the specific action of which the state plaintiffs complain can the defendant be said to have been "affirmatively executing duties" under the civil rights law.
 
 
 38
 Although the panel's holding is clear, it is not clear why the court reads such a requirement into the civil rights removal statute. The cases cited by the panel in support of its holding hardly exhibit the same rigidity as today's holding. Indeed, many of the cases, including Burns, make no mention of such a requirement. The case law, meager as it is, demonstrates, at most, that the relationship between the district court's order and the action taken by the defendant can become so attenuated that it cannot be said that the defendant's activity is motivated primarily by its obligation to comply with the consent decree.
 
 
 39
 The case law, therefore, reflects a far more realistic understanding of the role of an equitable decree in a civil rights matter. Fashioning such a decree is one of the most difficult tasks that a district court must perform. It requires the court to shape a remedy that will correct the federal injury and, in all other respects, leave the local community alone to handle its own affairs without the interference of federal authority. See Milliken v. Bradley, 433 U.S. 267, 280-81, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 (1977). The achievement of these dual goals requires that the district court navigate in a narrow channel, and often the best pilot for this journey is the defendant state official, who knows the channel better than anyone. Although the district court must set out clearly the objective of the federal remedy, the local official often must be given, as a matter of prudence and respect, a range of permissible options by which to achieve that goal.
 
 
 40
 Such flexibility as to means is often the most effective way by which a federal judicial officer can achieve the necessary federal objective, while assuring that those subject to or affected by the decree live otherwise undisturbed. Today, however, the court holds that, when a federal officer acts with restraint and concern for the local community, the order cannot be protected when others commence state litigation to thwart the exercise of the federal decree. The federal court is powerless when a third party attempts to deprive the federal defendant of the options the federal court intended it to have. Paradoxically, then, the federal order that is most effective and, at the same time, most restrained and most respectful of the limits of federal authority loses the protection of the federal court.
 
 
 41
 The hardship placed on district courts by this incongruous reading of the civil rights removal statute is illustrated graphically upon examination of the Second Interim order at issue in this case. A detailed document that no doubt embodies a great deal of effort by not only the judge but also the parties to the litigation, the order covers in detail the issue of the funding of the remedy. As the panel majority suggests, the district court no doubt wanted to assure itself that the school district had the legal authority to raise the necessary funding for the contemplated remedial programs. A reading of the order also makes clear that another motivation was no doubt operative in the decision to detail the permissible financial arrangements for implementation of the consent decree: assurance that the necessary funding to implement the agreed remedy was available. Indeed, a detailed delineation of the permissible and possible funding options is a key component in the formulation of a consent decree. Plaintiffs need to know that the substantive terms of the decree can be performed; defendants need sufficient flexibility to ensure that they can fulfill all of their responsibilities of governance. There are few areas in which the preservation of local options is more important to the accomplishment of the federal purpose. The panel majority never explains why the preservation of such local options ought to cause the loss of the federal protection afforded by the removal statute.
 
 2.
 
 42
 The majority's alternate ground for holding that the civil rights removal statute cannot be invoked is more far-reaching. The panel holds that, because the judgment of the district court is also a consent decree, its terms cannot be protected by the federal removal statute. Its sole authority for this extraordinary proposition is the statement in Firefighters Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 522, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986), that "it is the agreement of the parties, rather than the force of law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." From this statement, which I respectfully submit is not read in context,[3] the panel reasons that the terms of a consent decree are not worthy of protection because its terms are not carrying out a duty "under federal law providing for equal civil rights" but merely fulfilling obligations that the parties have undertaken.
 
 
 43
 As the majority correctly notes, consent decrees have been recognized as having a dual character. They possess some of the attributes of a judicial decree and some of the attributes of a contract. As the Court noted in Firefighters, this dual nature has required that the courts treat such decrees differently for different purposes. Id. at 519, 106 S.Ct. at 3073. The issue, then, is not whether we ought to label the decree a "judgment" or a "decree," but whether we ought to say that a state defendant's obedience to the decree is "derived from any law providing for equal rights."
 
 
 44
 This suit was brought under 42 U.S.C. §§ 1981, 1983 and the Fourteenth Amendment to the Constitution of the United States. These provisions certainly provide for equal rights within the meaning of the statute. The consent decree here was entered before the matter of liability had been formally adjudicated, but certainly was entered to address a colorable violation of the Constitution. "Like any other judicial decree, this one was entitled to respect...." Balark v. City of Chicago, 81 F.3d 658, 662 (7th Cir.1996), petition for cert. filed, 65 U.S.L.W. 3110 (July 31, 1996) (No. 96-167). Obedience to its terms was, as the court recently stressed in Kindred v. Duckworth, 9 F.3d 638, 641 (7th Cir.1993), "enforceable as a judicial decree that is subject to the rules generally applicable to other judgments and decrees." See also Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992). In making the decision to approve the decree, the district court was obliged to determine that the decree was reasonably calculated to remedy a condition that offends the Constitution, id. at 389, 112 S.Ct. at 762, and the record, as well as the decree itself, certainly supports the conclusion that the district court fulfilled its responsibilities in that regard. Until it was modified by the district court, see id. at 383-93, 112 S.Ct. at 759-65, the defendant owed it obedience as the order of a federal court enforcing the constitutional mandate of equal protection of the laws. In undertaking that duty of obedience, the defendant was entitled to the protection of the federal court from those who would deflect it from that obligation.
 
 3.
 
 45
 In my view, today's decision could have very far-reaching implications on the capacity of the district courts of this circuit to manage effectively institutional civil rights litigation. The consent decree, often forged with the cooperation of both parties, has proven to be an effective tool in the resolution of such cases. Party cooperation and assent is crucial. After today's decision, litigants will understandably be far less inclined to rely on such a device, despite its advantages in circumscribing disruption to the local community. Likewise, in formulating an equitable decree in such cases, district courts will be less inclined to afford defendant state officials, no matter how cooperative they may be, options in the manner of compliance. Consequently, federal judges will find themselves called upon more and more to micromanage the administration of equitable decrees and to intrude more significantly into matters of local concern. If this state of affairs were the unhappy consequence of a congressional mandate, however unintended, we would have to live with the consequences. But there is no evidence that Congress intended such a situation. The statute in question permits the removal of the action and its adjudication by the court. Accordingly, I respectfully dissent.
 
 
 
 [1]
 The evidence supporting the constitutional claims is extensively detailed in the district court's ultimate adjudication of liability in the PWC case. See People Who Care v. Rockford Bd. of Educ., 851 F.Supp. 905 (N.D.Ill.1994)
 
 
 [2]
 The tax objectors profess, and the school district does not dispute, that the taxes amounted to $7,827,786 in 1991 (11.49 percent of the school district's total levy), $9,807,911 in 1992 (13.34 percent of the school district's total levy), and $11,786,068 in 1993 (14.72 percent of the school district's total levy)
 
 
 [3]
 The appellants filed their tax objections in 1992, 1993, and 1994 for the taxes that were levied and collected in 1991, 1992, and 1993, respectively
 
 
 [4]
 Section 9-107 of the Tort Immunity Act states in relevant part:
 A local public entity may levy or have levied on its behalf taxes annually upon all taxable property within its territory at a rate that will produce a sum which will be sufficient to pay the cost of settlements or judgments under Section 9-102....
 
 
 [745]
 ILCS 109. -107. Section 9-102 in turn provides that "[a] local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages for which it ... is liable...." 745 ILCS 10/9-102 (emphasis added)
 
 
 [5]
 The Comprehensive Remedial Order contains a section titled "Finance," which discusses the economic condition of the school district, sources of funding the remedial relief, and the financial impact of the relief on the local community. In this order the district court set a cap on Tort Immunity Fund use in the amount of $25 million per year, with a maximum increase of 4 percent per year for four years. In 1995, the school district's regular revenues from the education fund were $140 million. Thus the $25 million in revenue from the Tort Immunity fund increased the total revenue of the school district by approximately 18 percent
 
 
 [6]
 This removal statute states in relevant part:
 Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.
 28 U.S.C. § 1441(a). We assume without deciding that the school district is a "defendant" in the tax objections proceedings within the meaning of the removal statute. See generally Chicago, R.I. & P.R. Co. v. Stude, 346 U.S. 574, 580, 74 S.Ct. 290, 294, 98 L.Ed. 317 (1954) (holding that federal court may disregard state law labels and re-align parties for purposes of removal statute).
 
 
 [7]
 Even if it were possible for the school district to enlarge its authority through the consent decree, federal law could only be relevant by way of a defense of federal authorization, and then only if the tax objectors had stated a valid claim for relief under state law. Thus the question of federal law would merely be "lurking in the background" and could not provide a sufficient basis for federal jurisdiction. Gully v. First Nat'l Bank in Meridian, 299 U.S. 109, 117, 57 S.Ct. 96, 99, 81 L.Ed. 70 (1936); see Franchise Tax Bd., 463 U.S. at 13-14, 103 S.Ct. at 2848-49
 
 
 [8]
 In Ultramar, the plaintiff originally filed a diversity suit in district court. After receiving an unfavorable judgment, the plaintiff filed similar state law claims in state court, and the defendant removed the case to district court. The Supreme Court in Federated Dep't Stores v. Moitie, 452 U.S. 394, 398 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981), upheld a district court's finding of artful pleading where the plaintiffs filed state law claims that were essentially identical to those made in a prior antitrust action that was dismissed in federal court. The Ninth Circuit distinguished Moitie based on the source of law underlying the prior federal judgment:
 When the prior federal judgment sounded in federal law, new purported state claims can be recharacterized as the old federal claims in disguise. But when the prior federal judgment was based on state law, new purported state claims can be "recharacterized" only as the old state claims from the first suit. In such a situation, there is not a federal claim in sight, and removal is impermissible even though res judicata probably bars the suit. The situation is directly analogous to that where federal law preempts state law yet fails to provide its own cause of action. In such a situation, although federal law is a perfectly valid defense to a state claim, that claim cannot be said to actually be a federal claim, for no federal right of action exists on point.
 Ultramar, 900 F.2d at 1416.
 
 
 [9]
 The school district relies on Striff v. Mason, 849 F.2d 240 (6th Cir.1988), in support of its position. Striff filed suit in state court, claiming that a civil service commission had failed to follow rules that it adopted pursuant to a federal consent decree. The Sixth Circuit found that the real nature of his claim was federal, reasoning that the "right" he sought to enforce was created by a federal consent decree and that the relief he requested would adversely impact the decree. We note that the holding of Striff on the merits--that third parties are not permitted to "collaterally attack" consent decrees--was expressly overruled in Martin v. Wilks, 490 U.S. 755, 762-63, 109 S.Ct. 2180, 2184-85, 104 L.Ed.2d 835 (1989). Furthermore, to the extent that Striff suggests that a purported state law claim arises under federal law if the claim would adversely impact a federal consent decree, we believe that the case is inconsistent with Supreme Court precedent and we decline to follow it
 
 
 [10]
 Again, we assume without deciding that the school district is a "defendant" within the meaning of 28 U.S.C. § 1443
 
 
 [11]
 Given this conclusion, we do not reach the question of whether Burns was correctly decided in light of Greenwood. We do note, however, that Greenwood clearly limited the application of the color of authority clause to federal officers charged with enforcing civil rights laws (and those acting under them). We therefore find questionable Burn's conclusion that a federal court can be considered a federal officer in this context. Courts interpret the law and determine what the law requires; they do not enforce the law. Enforcement of the law is the province of the executive branch of government. Revealingly, the Greenwood Court heavily based its conclusion on specific "language of enforcement" in the original Act, which allowed the removal of suits for "arrest or imprisonment, trespasses, or wrongs." 384 U.S. at 821-23, 86 S.Ct. at 1809-10. It is difficult to perceive federal judges engaging in this type of law enforcement activity
 
 
 [12]
 As an example of an ancillary duty, suppose the court had ordered the school district to desegregate by busing students. If the school district needed to hire additional bus drivers to transport the students, the school district would have an obligation under the court's order to hire the drivers
 
 
 [13]
 Although the dissent correctly observes that Firefighters was decided in a different factual context than the current case, both People Who Care and Dunn involved third-party challenges to the terms of a consent decree. In fact, this lawsuit first came before us in People Who Care, where we examined other provisions of the Second Interim Order. Thus, in the same context as the current appeal, we have found that the obligations contained in a consent decree derive from the agreement of the parties and not the law on which the complaint is based. See People Who Care, 961 F.2d at 1337; Dunn, 808 F.2d at 559
 
 
 [14]
 The Anti-Injunction Act provides:
 A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
 28 U.S.C. § 2283.
 
 
 [15]
 We first examined the provisions of the Second Interim Order in this People Who Care case. We found that the consent decree could not alter the contractual or state law rights of third parties without a finding that such a change was necessary to rectify a legal wrong. 961 F.2d at 1339. We posed the interesting question of whether the finding could be made on abbreviated proceedings, before the conclusion of litigation. Where a violation is clear, "consent" is "no more than knuckling under to the inevitable [and] is more like an adjudication than a contract." Id. at 1338. Ultimately, because the district court made no "necessity" finding, we declined to decide the question; we therefore assumed for the purposes of our analysis that the plaintiffs would be unable to show intentional discrimination. Id. at 1338
 
 
 [16]
 The district court found the defendant liable for violating the Constitution after the entry of the Second Interim Order. The school district does not argue that the subsequent liability finding should impact our jurisdictional analysis, but instead relies on the Second Interim Order as the sole predicate for the removal of the three tax objections
 We note that generally "if federal subject-matter jurisdiction is absent at the time of the original removal petition, the case must be remanded to state court." NPSA Serv. Corp. v. Independent Am. Sav. Ass'n, 868 F.2d 1415, 1418 (5th Cir.1989); see also United Farm Bureau Mut. Ins. Co. v. Metropolitan Human Relations Comm'n, 24 F.3d 1008, 1014 (7th Cir.1994) (holding that question of subject matter jurisdiction must be examined by looking to complaint at time of filing of petition for removal). Only the most recent tax objection was removed after the liability finding in the PWC case. For simplicity's sake and because the school district does not attempt to benefit from the liability finding, we do not examine the potential effects of the liability finding subsequent to the entry of the consent decree.
 
 
 [17]
 We use this term to refer to a finding by the district court that specific terms of a consent decree are necessary to remedy the violation of a legal wrong. In People Who Care, we left open the possibility that such a finding could be made before a formal liability finding. 961 F.2d at 1338
 
 
 [18]
 Because of the close parallels between the Anti-Injunction Act and the All Writs Act, allowing removal of the tax objections in this case would, as a practical matter, completely eviscerate the holding of Dunn. The parties in the federal action in Dunn asked the district court both to enjoin the state tax protests and to join the protestors in the federal litigation, thereby allowing the district court to hear the tax disputes. It would be strange indeed to allow the school district to accomplish under the All Writs Act exactly what Dunn held was not permissible under the Anti-Injunction Act
 
 
 [19]
 We note that the consent decree in Yonkers was entered after a finding of liability; and given the city's unwillingness to comply with the court's original remedial desegregation order, the Second Circuit found that the state court proceedings would interfere with the court's remedial order as well as the consent decree. 858 F.2d at 865. The Yonkers court, however, did not examine the issue of the different effects of consent decrees and fully adjudicated judgments on a court's ability to remove a case under the All Writs Act. Later Second Circuit cases discussing removal under the All Writs Act have likewise not considered this issue. See In re Agent Orange Prod. Liab. Litig., 996 F.2d 1425 (2d Cir.1993) (applying Yonkers where state court actions would interfere with pre-liability consent decree in multidistrict class action litigation), cert. denied, 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 434 (1994); United States v. City of New York, 972 F.2d 464 (2d Cir.1992) (applying Yonkers to protect a pre-liability consent decree regulating disposal of solid waste). The Second Circuit has more recently explicitly recognized the distinction between consent decrees and adjudicated judgments under the All Writs Act. Ass'n of Retarded Citizens of Connecticut, Inc. v. Thorne, 30 F.3d 367, 370-71 (2d Cir.1994) (holding that All Writs Act does not allow district court to join third-party in suit and bind that party to a previously entered consent decree), cert. denied, 513 U.S. 1079, 115 S.Ct. 727, 130 L.Ed.2d 631 (1995)
 
 
 [20]
 Given our disposition of this case, we need not resolve the difficult issue of whether the All Writs Act can ever create removal jurisdiction over a case. It is well-settled that the All Writs Act "does not provide federal courts with an independent grant of jurisdiction." New York Tel. Co., 434 U.S. at 188 n. 19, 98 S.Ct. at 380 n. 19 (Stevens, J., dissenting); see, e.g., Rosenbaum v. Bauer, 120 U.S. 450, 453-55, 7 S.Ct. 633, 634-35, 30 L.Ed. 743 (1887); McIntire v. Wood, 11 U.S. (7 Cranch) 504, 506, 3 L.Ed. 420 (1813); see also Akhil Reed Amar, Marbury, Section 13, and the Original Jurisdiction of the Supreme Court, 56 U. CHI. L. REV. 443, 459 (1989). As stated by the Court in Rosenbaum, "[t]he writ cannot be used to confer a jurisdiction which the ... court would not have without it. It is authorized only when ancillary to a jurisdiction already acquired." 120 U.S. at 455, 7 S.Ct. at 635 (quoting Bath County v. Amy, 80 U.S. (13 Wall.) 244, 249, 20 L.Ed. 539 (1871)). Thus, the Court has concluded that the writ cannot be used to file original actions in federal court. See, e.g., McIntire, 11 U.S. (7 Cranch) at 506. In the current case, the school district is attempting to use the writ to confer a jurisdiction which the district court would not have without it, but the writ is also ancillary to a jurisdiction already acquired. No court has yet to consider the issue of whether the All Writs Act can be interpreted, consistent with this Supreme Court precedent, to create this limited form of ancillary removal jurisdiction. Indeed, as far as we can tell, the Second Circuit in Yonkers was the first court to ever approve such a procedure, and no court outside the Second Circuit has ever used the All Writs Act as a removal device
 
 
 [21]
 The school district claims that the delay caused by our decision will, in itself, frustrate the implementation of the remedial programs ordered by the district court. The school district, however, cannot benefit from the delay caused by its improper removal of the tax objections
 
 
 [1]
 See Burns v. Board of School Comm'rs, 437 F.2d 1143 (7th Cir.1971), aff'g, 302 F.Supp. 309 (S.D.Ind.1969)
 
 
 [2]
 See, e.g., Bohlander v. Independent Sch. Dist. No. One, 420 F.2d 693, 694 (10th Cir.1969); Voinovich v. Cleveland Bd. of Educ., 539 F.Supp. 1100, 1101-02 (N.D.Ohio 1982); Buffalo Teachers Fed'n v. Board of Educ. of City of Buffalo, 477 F.Supp. 691, 693-94 (W.D.N.Y.1979)
 
 
 [3]
 In Firefighters, the Court was asked to determine whether a consent decree entered in a Title VII action could go beyond the specific terms of the statute. The Court answered that question affirmatively and made the statement upon which the majority relies in that context