PEOPLE WHO CARE, et al.,
Plaintiffs–Appellees,

v.

ROCKFORD BOARD OF EDUCATION
SCHOOL DISTRICT NO. 205,
Defendant–Appellee,

and

Rockford Education Association, et
al., Intervenors–Appellants.

No. 91–2438.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1991.

Decided April 22, 1992.

Ronald L. Futterman, Kathleen Mangold–Spoto, Robert C. Howard (argued), Hartunian, Futterman & Howard, Chicago, Ill., Andrew Campos, Rockford Area Hispanic Coalition, Centro Hispano Sembrador, Rockford, Ill., Eugene Eubanks, Kansas City, Mo., for plaintiff-appellee People Who Care.

Ronald L. Futterman, Kathleen Mangold–Spoto, Robert C. Howard (argued), Hartunian, Futterman & Howard, Chicago, Ill., for plaintiffs-appellees, Larry Hoarde, Chastity Hoarde, Johnathan Hughes, Shaheed Saleem, Anissa Tripplett, Asia Eason, Sidney Malone, Andre Malone, James Curtin, Kelly Curtin and Leonardo Medrano.

Lawrence J. Weiner, Justino D. Petrarca, Scariano, Kula, Ellch & Himes, Chicago, Ill., Thomas A. Bueschel, Conde, Stoner & Killoren, Rockford, Ill., Anthony G. Scariano (argued), Scariano, Kula, Ellch & Himes, Chicago Heights, Ill., John N. Schmidt, Rockford Public Schools, Rock-

ford, Ill., for defendant-appellee Rockford Bd. of Educ., School Dist. No. 205.

Stephen G. Katz, Katz, Friedman, Schur & Eagle, Chicago, Ill., Jeremiah A. Collins, Robert H. Chanin (argued), Susan Carle, Bredhoff & Kaiser, Washington, D.C., Barbara J. Buhai, Illinois Educ. Ass'n, Chicago, Ill., for intervenors-appellants Educational Office Personnel Ass'n, Rockford Bldg. Maintenance Ass'n, and Rockford Educ. Ass'n.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Pupils, parents, and civic associations filed this suit seeking desegregation of the public schools in Rockford, the second-largest city in Illinois. The district court certified a class of all black or Hispanic pupils in the district, plus all other children attending racially identifiable schools there.

Figures compiled for litigation during the 1970s showed that although minorities made up approximately 15% of the pupils in Rockford's schools, several elementary schools had more than 70% minority enrollment and one had more than 90%. The school district adopted a plan involving voluntary transfers and educational enrichment, see *Quality Education for All Children, Inc. v. School District No. 205*, 385 F.Supp. 803 (N.D.Ill.1974) (Bauer, J.), but imbalance persisted. A second suit foundered when the plaintiffs were unwilling to allege that Rockford's officials intentionally used race as a ground of decision. *Coates v. Illinois State Board of Education*, 559 F.2d 445 (7th Cir.1977). Plaintiffs in this suit have alleged intentional discrimination. But they have yet to prove it. They settled with the Board, and the court entered the settlement agreement as an injunction.

Under the consent decree the Board is to establish three magnet schools and several magnet programs. Another 15 schools will be home to supplemental programs for disadvantaged minority students. The Board believes that these programs will achieve more if it assigns teachers of its own choosing. Collective bargaining agreements with several unions contain seniority provisions giving teachers rather than principals the dominant role in matching teachers with schools. The settlement agreement undercuts seniority as a principle of assignment. Section B.11.b of the injunction provides that "[t]eaching staff for [the] programs shall be selected without emphasis on seniority and shall not be subject to displacement solely on the basis of seniority; rather, seniority shall be considered as one of the elements in determining qualification for selection or retention". Under the collective bargaining agreement the most junior teachers at a shrinking school are declared "surplus" and have bumping rights elsewhere in the system; under the injunction principals may choose teachers to let go without regard to seniority, and the "surplus" teachers lose their bumping rights at the magnet schools and new programs, which cover about 25% of the positions in the school district. The district's unions intervened to protest this alteration of their contracts.

Two other types of provisions in the injunction have drawn the unions' ire. Sections of the decree oblige the Board to establish training programs and specify the compensation for training time, to change class size, to extend the school year at one magnet school, to develop procedures to deal with complaints of discrimination, and so on. Unilateral action would abrogate the unions' entitlement, under state law, to bargain about changes in the terms and conditions of employment. The other category of provisions calls for racial preferences. Section E.7 of the decree compels the Board to discard the last-hired-first-fired system and instead to lay off white teachers exclusively, until it has reached specified levels of minority employment. Section E.6 requires the Board to take race into account when assigning teachers to schools. The unions contend that these provisions violate not only the collective bargaining agreements but also the equal protection clause of the fourteenth amendment. See *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90

L.Ed.2d 260 (1986); *Britton v. South Bend Community School Corp.*, 819 F.2d 766 (7th Cir.1987) (in banc). The district judge has suspended the application of §§ E.6 and 7, so we limit our attention to the provisions that alter the seniority rules and the obligation to bargain.

The district court issued the injunction on April 24, 1991. In June the court held what it called a "necessity hearing" to consider the unions' objections. This hearing took its name from language in *Brown v. Neeb*, 644 F.2d 551 (6th Cir.1981), to the effect that a court may abrogate parts of a contract when "necessary" to carry out the parties' agreement. The judge took evidence and in September issued an opinion concluding that "a sufficient factual predicate exists to support the District's decision to enter into" the consent decree. The court did not explain what this "factual predicate" is, but it appears to be racial imbalance in the schools. Next the court concluded that the decree is "necessary"—not to eliminate racial discrimination, for none has been found, but "necessary for equalizing the educational opportunities of minority students as compared to white students." Finally the court held that alteration of seniority is "necessary" to make the consent decree work. The decree's rules "are necessary to ensure staff quality, program quality and staff stability", which the court thought not only important to the success of the new programs but also hard to achieve when seniority allows teachers to choose where to teach.

■ Rockford has not admitted engaging in discrimination; it has denied all liability; the district court wrote that "there has not been an admission of ultimate liability by Defendant or a determination by the Court of such liability." The unions jump off from here. Consent decrees are fundamentally contracts. True, when the imprimatur of the injunction joins the parties' agreement, the result is more than a contract, but the source of authority to require the parties to act remains their acquiescence rather than rules of law. *Firefighters Local 93 v. Cleveland*, 478 U.S. 501, 519–22, 106 S.Ct. 3063, 3073–75,

92 L.Ed.2d 405 (1986). In consequence, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement." *Id.* at 529, 106 S.Ct. at 3079. See also *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); Larry Kramer, *Consent Decrees and the Rights of Third Parties*, 87 Mich.L.Rev. 321 (1988). In particular, they may not alter collective bargaining agreements without the union's assent. *W.R. Grace & Co. v. Rubber Workers Local 759*, 461 U.S. 757, 771, 103 S.Ct. 2177, 2186, 76 L.Ed.2d 298 (1983). Neither may litigants agree to disregard valid state laws. *Dunn v. Carey*, 808 F.2d 555, 560 (7th Cir.1986); *Kasper v. Board of Election Commissioners*, 814 F.2d 332, 340–41 (7th Cir.1987); *Bates v. Johnson*, 901 F.2d 1424, 1426 (7th Cir.1990). Cf. *Ragsdale v. Turnock*, 941 F.2d 501 (7th Cir.1991), at 510–11 (Posner, J., concurring), 515 (Flaum, J., dissenting in part); *Bass v. FSLIC*, 698 F.2d 328 (7th Cir.1983).

■ What the parties may do for themselves, they may do through a consent decree even if third persons lose out; so, for example, a city might agree with the EPA to build a new sewage treatment plant even though it must raise taxes to finance the project. A city does not need a court's blessing to raise taxes. When the parties to a decree seek to *enlarge* their legal entitlements—to grant themselves rights and powers that they could not achieve outside of court—their agreement is not enough. We held in *Dunn* that a local government may not use a consent decree to eliminate a requirement under state law that it conduct a referendum before issuing construction bonds. Many persons bridle at restrictions that state law and their own prior agreements create and sincerely believe that the public would be better off in the absence of these constraints. More than this belief, and more than the "consent" of the person seeking liberation from the obligation, is necessary to alter or avoid it.

The unions want us to stop here and adopt the holding of *United States v. Mia-*

*mi,* 664 F.2d 435 (5th Cir.1981) (in banc), that no consent decree may alter any collective bargaining agreement, unless the district court finds that the agreement violates the law or frustrates the remedy for such a violation. So long as the judge is agnostic about the existence of any violation, neither finding is possible—and Judge Roszkowski made neither. He found the decree necessary to curtail racial imbalance (and the alteration of seniority necessary to carry out the decree) but not that racial imbalance violates any rule of law. Recently the Supreme Court reiterated that racial imbalance does not offend any federal norm. "Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation." *Freeman v. Pitts,* —— U.S. ——, ——, 112 S.Ct. 1430, 1447, 118 L.Ed.2d 108, 136 (1992).

■ Remedies for violations of the Constitution may include altering statutory or contractual rules for assigning teachers to schools. So much has been clear since *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Is proof of a violation essential to the adoption of a remedy that affects third parties? Suppose that the violation were obvious—that Rockford had laws requiring segregation, or that its Board routinely drew school boundaries grouping pupils by race. Would it be necessary to adjudicate the obvious before adopting (or permitting the parties to agree on) a remedy that altered the assignment of teachers? Cf. *McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971). It is not wholly satisfactory to say that if the violation is clear the litigation will be swift and cheap; legal processes create opportunities for reluctant parties to postpone the day of reckoning. "Consent" that is no more than knuckling under to the inevitable is more like an adjudication than a contract. Perhaps this is what the sixth circuit had in mind in *Brown v. Neeb,* whose opaque opinions resist close analy-

sis. A "necessity" hearing then would be a cousin to a hearing leading to a preliminary injunction. The court would examine the evidence quickly, and if it found that victory for the plaintiffs was probable could approve a settlement reflecting the probable outcome of a contest. If a court may order preliminary relief without fully adjudicating the merits, may it not sometimes order relief on a combination of the parties' assent plus a review of the merits?

We need not decide whether a finding of probable success on the merits after a bobtailed factual inquiry, combined with the consent of the parties, could support the alteration of contracts. The district judge made no such finding. As the case comes to us, we must assume that the plaintiffs will be unable to show intentional discrimination.

■ Even a remedy supported by a summary finding must get at the wrong. "A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." *Freeman,* 112 S.Ct. at 1445. Courts have been reluctant to conclude that seniority systems are discriminatory or interfere with remedies for violations. E.g., *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Firefighters Local 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). Changing seniority or other contractual rights would make the remedial job easier, but this does not license a court to impose these changes on persons who have done no wrong. Suppose, for example, that Rockford were strapped for cash and could not afford magnet schools on its current budget. Cf. *Missouri v. Jenkins,* 495 U.S. 33, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990). Could the

Board and the plaintiffs then agree with each other (over the unions' objections) to reduce teachers' salaries by 10%, diverting the money to pay for books? That the unions' pension fund would contribute $100,000 toward the cost of the new programs?

Seniority has value, enabling teachers to obtain postings that pay more or return greater psychic income. The Board could buy out the teachers' seniority rights. Apparently it attempted to do so but found the price too steep. It then "agreed" with the plaintiffs to eliminate these rights, for free. This is a great deal for the Board, and with the savings it can achieve more of what plaintiffs desire. No surprise that the original litigants consented. New assignment rules may even be "necessary" to the achievement of their mutual objectives. But before altering the contractual (or state-law) entitlements of third parties, the court must find the change necessary to an appropriate remedy for a legal wrong. Even if this finding may come on abbreviated proceedings (a subject we have not decided), there must be such a finding. As there is none, we direct the district court to vacate those portions of the decree overriding the seniority provisions of the collective bargaining agreements or relieving the Board of its obligation to bargain with the unions. The case is remanded for proceedings consistent with this opinion.