In the
# United States Court of Appeals
## For the Seventh Circuit

No. 18-2805

STATE OF ILLINOIS,

*Plaintiff-Appellee,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee,*

APPEAL OF:

FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7,

*Proposed Intervenor.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-6260 — **Robert M. Dow, Jr.**, *Judge.*

_____

ARGUED NOVEMBER 2, 2018 — DECIDED JANUARY 2, 2019

_____

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* On August 29, 2017, the State of Illinois filed suit in federal court against the City of Chicago, alleging that the Chicago Police Department's use-of-force policies and practices violate the federal constitution and Illinois law. Two days later, the parties moved to stay the proceedings

while they negotiated a consent decree. Almost immediately after the State filed the complaint, the Fraternal Order of Police, Lodge No. 7, publicly indicated its opposition to any consent decree, citing fears that the decree might impair its collective bargaining rights. For months, the Lodge monitored the ongoing negotiations and met informally with the State's representatives. But the Lodge waited until June 6, 2018, to file a motion to intervene in the suit. The district court denied the motion to intervene as untimely. Because the Lodge knew from the beginning that a consent decree might impact its interests but delayed its motion for nearly a year, and because its allegations of prejudice are speculative, we affirm.

## I. BACKGROUND

In April 2016, the Chicago Police Accountability Task Force issued a report finding that the Chicago Police Department's "response to violence is not sufficiently imbued with Constitutional policing tactics." (R. 1-1 at 14.) In January 2017, the United States Department of Justice released a report concluding that the Chicago Police Department exhibits a pattern or practice of the unconstitutional use of force. The report found that Chicago's inadequate accountability mechanisms are a significant contributor to the repeated constitutional violations. The Department of Justice suggested that effective reform was unlikely without "[a] court-ordered, over-arching plan … that is overseen by a federal judge." (*Id.* at 211.)

On August 29, 2017, the State of Illinois filed suit against the City of Chicago, alleging that the City's policing practices involve the repeated use of excessive force. Two days later, the parties moved to stay proceedings while they engaged in consent decree negotiations. The district court granted that motion.

Immediately after the State filed suit, the Lodge publicly expressed its opposition to any consent decree. In a news article published the evening of August 29, 2017, the Lodge's president, Kevin Graham, described a consent decree as a "a potential catastrophe for Chicago." (R. 73 at 4 & n.1.) Mr. Graham elaborated on his opposition to a consent decree in the Lodge's September 2017 newsletter. He voiced the fear that a consent decree might "seriously threaten our collective bargaining rights" and assured the Lodge that no one in his administration believed that a consent decree was "necessary." (R. 73-1 at 13.)

Despite these public concerns over the suit's potential impact on collective bargaining rights, the Lodge did not seek to intervene at that time. Instead, during the subsequent months of negotiation between the State and City, the Lodge repeatedly met separately with the State. At those meetings, the Lodge expressed its concern that the inchoate consent decree might conflict with provisions of the Collective Bargaining Agreement ("CBA") or with Illinois statutes which protect police officers. The State told the Lodge that it did not intend to intrude into matters of police officer discipline or other "core mandatory matters." (R. 81-4 at 6.)

To that end, and to avoid the need for the Lodge to intervene, the State and Lodge focused on creating "carve-out" language that would ensure the consent decree left CBA rights intact. During these informal discussions, which began in the fall of 2017 and continued well into the spring of 2018, the State often assured the Lodge that it was working with the City to avoid any impact on CBA rights. The State never provided the Lodge with copies of the proposed consent decree or with finalized carve-out language. Nevertheless, the State's

representative, Gary Caplan, assured the Lodge that the draft consent decree did not conflict with the CBA and that, if any consent decree provisions did conflict, the CBA would control.

Between March 21, 2018, and May 25, 2018, the district court met four times with the parties to discuss the consent decree negotiations. On two of those occasions, Lodge representatives appeared at the courtroom and requested permission to attend the session. Both times, the City and State refused to consent to the request.

On June 6, 2018, the Lodge moved to intervene. The Lodge has offered a variety of explanations for its decision to seek intervention. In the motion to intervene, the Lodge attributed the motion to its discovery that, on May 15, 2018, a number of community groups "published and undoubtedly submitted to the [State] a report that contains recommendations for the consent decree." (R. 51 at 5.) The Lodge emphasized that the CBA "contains provisions addressing a number of the subjects raised in the complaint filed by the Office of the Illinois Attorney General in this case." (*Id.* at 6.) Because many of the recommendations made by the community groups would require "substantive modifications" to practices or activities covered by the CBA, the Lodge believed that intervention was necessary. The Lodge also argued that the complaint—filed nine months earlier—sought injunctive relief that would conflict with the CBA. Thus, at the time, the Lodge did not cite its exclusion from negotiations as a reason for intervention. Likewise, the Lodge did not move to intervene due to surprise language in the consent decree (because the Lodge had not yet received a copy of the draft consent decree).

In early July 2018, the Lodge filed a motion to hold proceedings in abeyance while the court considered the motion to intervene. In that motion, the Lodge argued that it had "reason to believe that the consent decree will impact the collective bargaining agreement," but the Lodge based that belief "on the January 2017 Department of Justice report … and the representations in the [August 31, 2017] motion to stay concerning the failure of the City to administer effective police discipline." (R. 65 at 2.)

On July 27, 2018, the State and City made the proposed consent decree public. The draft includes numerous provisions which the Lodge believes conflict with the disciplinary and investigative provisions of the CBA. The proposed consent decree also contains a paragraph addressing conflicts between the consent decree and CBAs:

> 687. Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any successor CBAs resulting from the negotiation process … mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law, or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs … , the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent

> necessary to provide for the effective implementa-
> tion of the provisions of this Consent Decree.

(R. 81-2 at 217.)

On August 8, 2018, the district court directed the State, City, and Lodge to submit supplemental briefs addressing the Lodge's contention that the consent decree would adversely affect CBA rights. In particular, the district court directed the Lodge to explain whether ¶ 687 of the draft consent decree ameliorated its concerns. On August 16, 2018, after receiving the supplemental briefing, the court denied the motion to intervene as untimely. The Lodge appealed.

While the Lodge's appeal has been pending, the district court's consideration of the draft consent decree has continued. The Lodge moved to stay review of the consent decree during the pendency of its appeal, but the district court has not yet ruled on that motion. The district court held the fairness hearing on October 24 and 25, 2018. Prior to that hearing, the district court received hundreds of written comments, including one from the Lodge. Given the level of interest, the district court limited participation in the fairness hearing to a randomly selected group of applicants, each of which spoke for five minutes. The record is unclear whether any Lodge members received an opportunity to speak at the fairness hearing. But, in the weeks since the hearing, the Lodge has submitted numerous supplemental comments from its members.

## II. ANALYSIS

Because denial of a motion to intervene essentially ends the litigation for the movant, such orders are final and appealable. *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir.

1995). The Lodge sought to intervene as of right, meaning the requirements of Federal Rule of Civil Procedure 24(a)(2) apply: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Shea v. Angulo*, 19 F.3d 343, 346 (7th Cir. 1994) (quoting *Southmark Corp. v. Cagan*, 950 F.2d 416, 418 (7th Cir. 1991)). "A motion to intervene as a matter of right, moreover, should not be dismissed unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint." *Reich*, 64 F.3d at 321 (quoting *Lake Investors Dev. Group v. Egidi Dev. Group*, 715 F.2d 1256, 1258 (7th Cir. 1983)). "[W]e must accept as true the non-conclusory allegations of the motion." *Id.* The district court found that the Lodge's motion satisfied the final three requirements but denied the motion to intervene after concluding it was untimely. For that reason, we focus solely on the timeliness requirement.

"We look to four factors to determine whether a motion is timely: '(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances.'" *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 797–98 (7th Cir. 2013) (quoting *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000)). When the district court denies a motion for intervention as untimely, we review for abuse of discretion. *Id.*

*A. Knowledge of Interest*

The district court found that the Lodge should have known of its interest in the suit from the time the State filed suit. Because nine months passed before the Lodge sought to intervene, the motion was untimely. Now, the Lodge argues that the district court erred because it did not learn its interests might be impaired until "after the Lodge was shut out of settlement discussions and the Lodge had received information from confidential sources that its contractual rights would be impaired." (Appellant's Br. at 24.)

"A prospective intervenor must move promptly to intervene as soon as it knows or has reason to know that its interests *might* be adversely affected by the outcome of the litigation." *Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 701 (7th Cir. 2003) (emphasis added); *see also Sokaogon Chippewa*, 214 F.3d at 949 ("As soon as a prospective intervenor knows or has reason to know that his interests *might* be adversely affected by the outcome of the litigation he must move promptly to intervene.") (citation omitted) (emphasis added); *Reich*, 64 F.3d at 321 ("[W]e determine timeliness from the time the potential intervenors learn that their interest *might* be impaired.") (emphasis added); *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 824 F.2d 531, 535 (7th Cir. 1987) (finding a motion to intervene untimely because the movant "had knowledge that its interests could be affected more than 11 months prior to the time it sought intervention"). Thus, we measure from when the applicant has reason to know its interests *might* be adversely affected, not from when it knows for certain that they will be.

The Lodge does not dispute that, immediately after the State filed the lawsuit, it publicly opposed any consent decree.

In fact, Lodge President Graham asserted in his September 2017 newsletter article that a consent decree "could seriously threaten ... collective bargaining rights." (R. 73-1 at 13.) The conclusion that the City, State, and Lodge do not share interests is hardly remarkable. The Lodge's very existence is rooted in the competing interests between its members and the City. And the complaint emphasized the need for increased accountability and other significant reforms which would inevitably impact police officer interests. Thus, the Lodge waited nine months from the time it became clear that the lawsuit might affect its interests. The Lodge's delay renders the motion untimely. *See Westinghouse*, 824 F.2d at 535 ("[A]n examination of the initial factor in our analysis, the length of time the prospective intervenor knew or reasonably should have known of its interest before it petitioned to intervene (11 months), clearly establishes that [the] motion to intervene was untimely.").

The Lodge argues that the timeliness inquiry should instead run from the time it determined that the State was not protecting its interests. Specifically, the Lodge contends that it reasonably relied on the State's assurances that it was protecting the Lodge's interests.

The cases the Lodge relies on offer it no aid. In several prior cases, we have indicated that intervention may be timely where the movant promptly seeks intervention upon learning that a party is not representing its interests. *See Reich*, 64 F.3d at 321–22 (reversing denial of the motion to intervene because the movants "reasonably believed their employer was representing their interests and, considering the believed adequacy of representation, could not have legitimately petitioned to intervene"); s*ee also United States v. Alcan Aluminium*, 25 F.3d

1174, 1183 (3d Cir. 1994) ("[W]here a party induces an applicant to refrain from intervening and there is reasonable reliance, the applicant's motion should not fail on timeliness grounds."); *United States v. City of Chicago*, 870 F.2d 1256, 1263 (7th Cir. 1989) ("[W]hen a federal judicial decree unexpectedly impairs settled expectations, and does so on what might appear to be arbitrary and discriminatory grounds, the judge is obliged to listen to the victims of the decree when they make prompt application to intervene."); *Sokaogon*, 214 F.3d at 949 (characterizing *City of Chicago* as a case "where the white female police officers who wanted to intervene could not have anticipated that the new procedures would discriminate against them").

These are all cases where the intervenor could not have reasonably anticipated that its interests were at issue or unrepresented until immediately prior to the attempted intervention. But where the intervenor "has known all along that its interests are directly pitted against" those of the parties, then the mere fact that the precise outcome of the litigation was unexpected does not restart the timeliness analysis. *Sokaogon*, 214 F.3d at 950. *Reich*, *City of Chicago*, and *Alcan* support affirmance because the Lodge has not shown that it reasonably believed that its interests were not at issue or protected, much less that those interests were then unexpectedly impaired.

The Lodge emphasizes that State's representatives repeatedly assured them that the consent decree would not impact CBA rights. But the very fact that the Lodge and State were discussing the need for "carve-out" language makes clear that both anticipated that the consent decree would address matters which arguably fell under the purview of the CBA. The

State also refused to provide copies of the draft proposals the State and City were exchanging. And the State and City excluded the Lodge from the settlement conferences with the district court, despite the Lodge showing up and asking to be admitted. Thus, there were many indicators that the Lodge's interests were "directly pitted" against the State's and City's.

And, more importantly, the Lodge does not identify an unexpected development which would excuse its delay. The motion for intervention cited the community group recommendations as a threat, but those recommendations were nonbinding. The motion also asserted that the injunctive relief requested in the August 2017 complaint would impair CBA rights. But that argument simply underscores the Lodge's nine-month delay. In fact, in the subsequent motion to hold proceedings in abeyance, the Lodge pointed to the Department of Justice's January 2017 report as the reason it believed its rights were at issue. We do not dispute that the Lodge could have sought intervention by relying on the complaint and report. But the Lodge's reliance on those documents demonstrates that the justification for intervention did not appreciably change between August 2017 and June 2018.

Even the Lodge's *ex post* reason for intervention (information from confidential sources) suffers from this flaw. Remember that, until July 2018, the Lodge had not received any consent decree draft language or been permitted to participate directly in settlement negotiations. In May 2018, confidential sources allegedly told the Lodge that "there were consent decree provisions that would conflict with the provisions of the collective bargaining agreement." (R. 81-4 at 8–9). But those sources did not provide copies of those provisions (much less copies of any carve-out language). Based on this

information, the Lodge determined that the consent decree might impact its interests. But the Lodge never identifies the specific information that these sources provided which the Lodge could not have previously intuited from the complaint or discussions with the State. For these reasons, the district court did not abuse its discretion in determining that the Lodge had notice of its interest beginning in August 2017.

### B. Prejudice to the State and City

We next consider "the prejudice caused to the original parties by the delay." *Grochocinski*, 719 F.3d at 797–98. The prejudice here is manifest. "Once parties have invested time and effort into settling a case it would be prejudicial to allow intervention." *Ragsdale v. Turnock*, 941 F.2d 501, 504 (7th Cir. 1991). That is particularly true when the settlement negotiations were complex and well-publicized, as was the case here. *See id.*; s*ee also City of Bloomington*, 824 F.2d at 536. The Lodge argues that the prejudice caused by its delay was minimal because it only waited several weeks from the time it determined its interests were at stake before filing its motion. But if the Lodge's delay began when the State filed the complaint—as the district court properly calculated—then the prejudice becomes significant. The district court did not err in determining that intervention would cause prejudice.

### C. Prejudice to the Lodge

The Lodge next argues that the district court erred in finding that the potential for prejudice to the Lodge was insufficient to mandate intervention. When the district court properly denies a motion to intervene, the applicants cannot "attack the fairness of [a] consent decree because they are not *parties* to the agreement." *B.H. by Pierce v. Murphy*, 984 F.2d

196, 199 (7th Cir. 1993) (quoting *City of Chicago*, 908 F.2d at 200)). But the inability to appeal the entry of a consent decree does not always mandate intervention. Rather, when the interested party can adequately convey its concerns to the district court at the fairness hearing, prejudice is often minimal. *See City of Bloomington*, 824 F.2d at 537 ("Because [the proposed intervenor] has already had an opportunity to present its views to the district court, it would suffer little prejudice if it were denied permission to intervene at this late stage in the proceedings."). The Lodge has enjoyed repeated (and continuing) opportunities to do so.

The Lodge believes the draft consent decree will impair CBA rights and displace protections provided by Illinois statutes. The district court found that there was "some evidence that parts of the current draft consent decree may conflict with the CBA, the [Illinois Public Labor Relations Act], or other state laws." (R. 88 at 17.) For the purposes of this opinion, we will assume that certain provisions of the draft consent decree conflict—on their face—with the CBA and Illinois law.

Notwithstanding that potential for conflict, the Lodge's rights are protected. We begin with the carve-out language included in the decree. That provision expressly confirms that "[n]othing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate … the terms of the CBAs … with respect to the subject of wages, hours, and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy." (R. 81-2 at 217.) The Lodge argues that this provision is "wholly different from a 'shall not conflict with' prohibition for the City and the [State] to impinge upon the CBA." (Appellant's Br. at 33.) The language speaks for itself. Read as a whole, ¶ 687 makes clear

that the parties do not intend for the consent decree to be interpreted as impairing CBA rights.

The Lodge also argues that the exception in ¶ 687, indicating that the decree may displace CBA provisions if they "violate the U.S. Constitution, Illinois law or public policy," swallows the rule. "Public policy" is undefined, and so there is arguably ambiguity regarding what triggers that exception.

But, as the district court recognized, existing law already provides protections for the Lodge. "Before entering a consent decree the judge must satisfy himself that the decree is consistent with the Constitution and laws, does not undermine the rightful interests of third parties, and is an appropriate commitment of the court's limited resources." *Kasper v. Bd. of Election Comm'rs of the City of Chicago*, 814 F.2d 332, 338 (7th Cir. 1987). Similarly, consent decrees "may not alter collective bargaining agreements without the union's assent." *People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 961 F.2d 1335, 1337 (7th Cir. 1992). "Neither may litigants agree to disregard valid state laws." *Id.* In other words, because "[c]onsent decrees are fundamentally contracts," the parties to those decrees "'may not impose duties or obligations on a third party, without that party's agreement.'" *Id.* (quoting *Firefighters Local 93 v. Cleveland*, 478 U.S. 501, 529 (1986)).

The parties negotiate and the district court considers the consent decree against this background law, which protects the Lodge even if ¶ 687 contains ambiguities. Simply put, a consent decree cannot accidentally eliminate the rights of third parties. And if the parties interpret the consent decree in a way which violates CBA rights, the Lodge can avail itself of normal remedies for CBA violations. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum &*

*Plastic Workers of Am.*, 461 U.S. 757, 770 (1983) (affirming the enforcement of an arbitration award for violating the CBA, even though a settlement agreement required the company's violation).

Admittedly, "[c]onsent decrees can alter the state law rights of third parties." *Application of Cty. Collector of Cty. of Winnebago, Ill.*, 96 F.3d 890, 901 (7th Cir. 1996). But that's true "only where the change is *necessary* to remedy a violation of federal law." *Id.* (emphasis added); *see also People Who Care*, 961 F.2d at 1339 ("[B]efore altering the contractual (or state-law) entitlements of third parties, the court must find the change necessary to an appropriate remedy for a legal wrong."). The district court has made no finding of necessity. To the contrary, the court emphasized that it "is obligated to uphold the applicable law in resolving any real conflicts between the proposed decree and any existing or future contracts." *Illinois v. City of Chicago*, No. 17-CV-6260, 2018 WL 3920816, at *8 (N.D. Ill. Aug. 16, 2018). The district court noted that consent decrees typically cannot subvert CBA rights, but reminded the parties that "a CBA also must comply with federal law." *Id.* at *9.

Thus, the Lodge's assertion of prejudice is largely speculative. As things stand now, the consent decree cannot impair the CBA or state law rights enjoyed by Chicago police officers. That will change only if the district court concludes that federal law requires the abrogation of those rights. Even then, the abrogation must be narrowly tailored. We decline to speculate whether federal law will require such a remedy here. On the present facts, the district court did not abuse its discretion in finding that intervention was unwarranted given the minimal prejudice identified by the Lodge.

There is one final matter worth discussing. The district court assured the Lodge that, "if the assumptions about the future course of this litigation described above should turn out to be radically incorrect, nothing in the rules or the case law of which this court is aware would prevent re-examination of the matter of intervention." *City of Chicago*, 2018 WL 3920816, at *11 n.5 (citing *State v. Dir., U.S. Fish & Wildlife Serv.*, 262 F.3d 13, 21 (1st Cir. 2001)). That is correct. The Lodge's allegations of prejudice are presently speculative, and the other factors counsel against intervention. But if the Lodge's fears are substantiated, the balance of interests will shift.

*D. Unusual Circumstances*

We consider a final factor: whether any unusual circumstances mitigated or aggravated the delay. The district court did not consider this factor in a separate section. The Lodge argues that the failure to consider all four factors mandates reversal. (Appellant's Br. at 15 (citing *Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 701 (7th Cir. 2003) (reversing because the district court's analysis of timeliness factors did not correspond to the four factors and because other aspects of the reasoning were too conclusory for "us to identify the reasoning behind the holdings"))). The Lodge only identifies one unusual circumstance here: the "reasonable reliance" argument addressed above. But the Lodge never squarely presented that legal theory to the district court. And the district court considered the facts underlying the argument but found them unpersuasive. *See City of Chicago*, 2018 WL 3920816, at *5–6. Our precedent merely requires that the district court consider the appropriate factors and discuss them in detail sufficient for us to review on appeal. *See Heartwood*, 316 F.3d at 701. When a party fails to specifically identify unusual

circumstances, the district court does not err in focusing on the disputed factors.

### III. CONCLUSION

The Lodge knew from the filing of the complaint that the consent decree might affect its interests. Indeed, the Lodge tacitly admitted this when it relied on allegations in the complaint—including reports from 2016 and 2017—in arguing to the district court that intervention was necessary. And setting the delay aside, the Lodge's assertions of prejudice are presently unsubstantiated. Existing law provides significant safeguards for the Lodge's interests. If those protections prove insufficient, then a renewed motion for intervention might be appropriate. But on the facts as they currently stand, the district court did not abuse its discretion in finding the Lodge's motion untimely.

Accordingly, we AFFIRM the district court's denial of the motion for intervention.